# In the United States Court of Federal Claims

**No. 19-1624C**
**Filed: February 19, 2020**
**Redacted Version Issued for Publication: March 5, 2020[1]**

| | |
|---|---|
| * * * * * * * * * * * * * * * * * *<br><br>**MCI DIAGNOSTIC CENTER, LLC,**<br><br>  **Protestor,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>  **Defendant,**<br><br>**v.**<br><br>**LABORATORY CORPORATION OF AMERICA,**<br><br>  **Defendant-Intervenor.**<br><br>* * * * * * * * * * * * * * * * * * | *<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*<br>*  **Pre-Award Bid Protest; Cancellation;**<br>*  **Motion to Dismiss; Lack of Subject-**<br>*  **Matter Jurisdiction; Standing.**<br>*<br>*<br>*<br>*<br>*<br>* |

**Jonathan D. Perrone**, Whitcomb, Selinsky, PC, Denver, CO, for protestor.

**Isaac B. Rosenberg**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him was **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Joseph H. Hunt**, Assistant Attorney General, Civil Division. Of counsel was **Natica C. Neely**, Staff Attorney, United States Department of Veterans Affairs, Office of General Counsel, District Contracting National Practice Group, Washington, D.C.

**William M. Jack**, Kelley Drye & Warren LLP, Washington, D.C., for intervenor. With him was **Elizabeth C. Johnson** and **Amba M. Datta**, Kelley Drye & Warren LLP, Washington, D.C.

---

[1] This Opinion was issued under seal on February 19, 2020. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with some of the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

**O P I N I O N**

**HORN, J.**

Protestor, MCI Diagnostic Center, LLC (MCI), challenges the cancellation of Solicitation No. 36C25619Q1507 (the Solicitation) for laboratory reference testing, issued by the United States Department of Veterans Affairs (VA) for the Michael E. DeBakey VA Medical Center (MEDVAMC), located in Houston, Texas. Protestor asserts that the Solicitation was canceled after the VA improperly evaluated its proposal, and that protestor would have had a substantial chance of award had the VA not improperly done so. Specifically, protestor disputes the evaluation of its proposal by MEDVAMC's Management and Program Analyst, Peter Basten, who was the individual identified in the record who ultimately requested that the contracting officer cancel the Solicitation. Protestor asserts in its motion for judgment on the administrative record that defendant's "evaluation was arbitrary and capricious, an abuse of discretion, lacking rational basis, or otherwise contrary to the law." Defendant and intervenor, Laboratory Corporation of America (LabCorp), move to dismiss protestor's bid protest for lack of subject-matter jurisdiction, and also cross-move for judgment on the administrative record.

**FINDINGS OF FACT**

The Existing Blanket Purchase Agreement

The parties have stipulated that the Michael E. DeBakey VA Medical Center (MEDVAMC) is located in Houston, Texas, within VISN 16 [Veteran Integrated Service Network 16], one of the "18 geographically-based" VISNs. The parties further stipulated that "[i]n August 2017, VISN 16 established a blanket purchase agreement (BPA) with LabCorp—under LabCorp's Federal Supply Schedule 66 (Scientific Equipment and Services) contract administered by the General Services Administration—for the provision of reference laboratory testing and analysis services to VHA [Veterans Health Administration] facilities throughout VISN 16." The Blanket Purchase Agreement, BPA No. VA256-17-A-0016 (BPA), states:

Pursuant to the Federal Supply Schedule (FSS) and FSS Contract Clause I-FSS-646, it is the intent of the Department of Veterans Affairs, South Central VA Health Care Network, hereafter called VISN 16, to establish a Blanket Purchase Agreement (BPA) for medical laboratory testing and analysis services. The purpose of this BPA is to standardize the referral laboratory services for all medical centers and outpatient clinics in VISN 16 and to decrease the costs associated with referral laboratory testing and analysis. This BPA will increase the laboratory's ability to support patient care by providing access to tests that due to cost of reagents, equipment, and low volume are not performed within the VA Medical Centers. . . . The Contractor shall adhere to the following terms of the BPA exclusively with the VISN 16 VA Medical Centers (VAMC's) and Outpatient Clinics listed below.

(capitalization in original). In addition to Houston, Texas, which is where MEDVAMC is located, the BPA covers VAMC's and outpatient clinics in Alabama, Arkansas, Florida, Louisiana, and Mississippi.

Section I.2 of the BPA, titled: "**ORDERS**," states:

The award of the BPA will not result in a binding contract nor will it obligate funds. Government is obligated only to the extent of authorized orders actually issued under the BPA by authorized individuals. Any order awarded against the BPA will be binding and the language, terms and conditions (including modifications) in the BPA will flow down to any individual order awarded. In the event of inconsistency between the provisions of the BPA and the contractors invoice, the provisions of this BPA will take precedence.

(capitalization and emphasis in original). Section I.3 of the BPA, titled: "**PRICES AND TERMS**," states:

VISN 16 shall provide a list of referral tests performed and <u>estimated volume</u> of those tests (Attachment B) for VISN 16 facilities. The Government estimates the volumes listed in the attached spreadsheet per facility, but does not guarantee volumes as listed; they are <u>ESTIMATES ONLY</u>. Pricing shall be a firm fixed price per test. The Attachment C contains combined volumes for all VISN 16 facilities. VISN 16 reserves the rights to modify the BPA based on estimated usage provided by the VAMC's as they increase/decrease their volume/usage or as new testing methods or tests are added to the medical community and referral testing service provider's menu.

(capitalization and emphasis in original). Section I.4 of the BPA, titled: "**TERM OF AGREEMENT**," states that "[t]his is a single award, firm-fixed price BPA effective August 1, 2017 through July 31, 2018 with four, one-year options and shall be effective for the term of the FSS Contract including additional FSS extensions." (capitalization and emphasis in original).

Attached to the BPA is a table of approximately 1,500 laboratory tests and services, with corresponding codes and prices. Above the table, the BPA states: "Contractor: Laboratory Corporation of America (LabCorp)" and "V16 BPA#: VA256-17-A-0016." In total, the table contains the following ten columns: (1) "**Offeror Test Code**;" (2) "**CPT Code(s)**;" (3) "**Test Name**;" (4) "**Estimated Annual Volume**;" (5) "**On FSS contract (indicate Y or N)**;" (6) "**BPA Price/Test**;" (7) "**Annual BPA Estimated Cost**;" (8) "**FSS Price/Test**;" (9) "**Annual FSS Estimated Cost**;" and (10) "**Cost Savings/Cost Avoidance**." (emphasis in original). At the end of the table, the "**Total Annual Estimated Cost**" is listed as $2,506,640.69. (emphasis in original). The table also provides that the total estimated cost, if the BPA were to be extended until July 31, 2022, would be $12,533,203.45.

3

As discussed above, the BPA states that "[t]he award of the BPA will not result in a binding contract," and that the "[g]overnment is obligated only to the extent of authorized orders actually issued under the BPA." The parties have stipulated that "[i]n October 2018, pursuant to the VISN 16 BPA, the VA issued a task order to LabCorp to provide reference laboratory testing and analysis services to MEDVAMC for the period [of] October 1, 2018, to September 30, 2019 (FY 2019)." The Standard Form 1449 for the October 2018 Task Order references the BPA contract number, VA256-17-A-0016. The October 2018 Task Order states, under the "**ITEM INFORMATION**" heading, the following information:

| ITEM NUMBER | DESCRIPTION OF SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0001 | | 12.00 | MO | $140,000.0000 | $1,680,000.00 |
| | MONTHLY LAB CORP REFERENCE LAB TESTING LOCAL STOCK NUMBER: N/A | | | | |
| | | | | **GRAND TOTAL** | **$1,680,000.00** |

(capitalization and emphasis in original). The October 2018 Task Order does not, however, state which laboratory tests and services are associated with the Task Order, or to which VA Medical Center within VISN 16 the Task Order is directed.

Pre-Solicitation Actions by MEDVAMC

The parties have stipulated that

[o]n April 25, 2019, an independent government cost estimate (IGCE) was prepared by Peter Basten (a management and program analyst for MEDVAMC's Diagnostic & Therapeutic Care Line), which set out the anticipated cost of procuring anatomic pathology laboratory testing services for MEDVAMC over a five-year period beginning October 1, 2019, and ending September 30, 2024.

The IGCE in the administrative record for the Solicitation at issue contains 611 line-items of laboratory test and services, "some of which," the parties stipulated, "overlap with the approximately 1,500 reference laboratory testing and analysis services included in the VISN 16 BPA with LabCorp."[2] The IGCE consists of the following seven columns: (1) "**Test # &/or Code**;" (2) "**CPT Code**;" (3) "**Description/Part Number (Test Name)**;" (4) "**Est. Qty**;" (5) "**Unit**;" (6) "**Price**;" and (7) "**Extended Amount**." (emphasis in original). On the last page of the IGCE, under the "**Extended Amount**" column, it states that the "**Total Cost of Base Period**" equals $597,830.75, and the "**Grand Total Cost of Base + 4 Option Periods**" equals $2,989,153.75. (emphasis in original). At the bottom of the last page of the IGCE, Peter Basten, a Management & Program Analyst for the Michael E. DeBakey VA Medical Center, is identified as the point of contact. Also included at the end

---

[2] Some of the line-items of laboratory tests and services in the IGCE appear to be duplicates of each other.

of the IGCE are the following two comments: "Base year needs to be about $600K," and "[e]ach of the option years should be appoximately [sic] the same cost and usage (minimal fluctuation)." Under the heading labeled: "***Check block(s) below that describe the basis for the IGCE***," the blocks for "Informal Vendor Quotes," and "Prior Bills of Material" are checked. (capitalization and emphasis in original).

On April 30, 2019, Mr. Basten completed a Market Research Worksheet, which states:

> Statement of Need: The Michael E. DeBakey VA Medical Center (MEDVAMC) is pursuing a contract with a base year with four one-year options and an emergency six-month extension at the end of the last option year for anatomic pathology laboratory testing with Arup Laboratories.[3] The contractor must be certified by the College of American Pathologists (CAP), perform testing in accordance with Clinical Laboratory Improvement Amendments (CLIA) and provide all the tests listed in the Statement of Work.

(capitalization in original). The Market Research Worksheet also answers the question: "Has the requirement been purchased by the Department of Veterans Affairs (VA) previously?" in the negative. Under the Section 1.b.(iii) of the Market Research Worksheet, the following instruction was provided to those filling out the Market Research Worksheet:

> If you are aware of existing contractual vehicles that can be utilized for the requirement, list applicable contracts and their contract numbers. **Note:** VA must set aside procurements for competition among **veteran-owned small businesses** "if a Contracting Officer has a reasonable expectation that two or more small businesses owned and controlled by veterans will submit offers and that the award can be made at a fair and reasonable price that offers the best value to the United States." Please search the <u>Vendor Information Pages (VIP)</u> database by applicable <u>North American Industry Classification System (NAICS)</u> codes to determine if two or more **veteran-owned small businesses (SDVOSBs) or veteran-owned small businesses (VOSBs)** can provide the item/service. See the list of existing contract vehicles below.

---

3 Associated Regional and University Pathologists Laboratories, Inc. (ARUP Laboratories), is mentioned by the VA multiple times throughout the administrative record in relation to the Solicitation at issue in the above-captioned bid protest. As discussed below, however, ARUP Laboratories was not mentioned in the actual Solicitation document, did not submit a proposal to the Solicitation, was not awarded any contract in relation to this Solicitation, and does not appear to be related to any party involved in this litigation. Moreover, the VA is inconsistent in when it capitalizes "ARUP," or uses lower case references to "Arup."

(capitalization and emphasis in original). Under this instruction, the following information was provided:

| **Contract Vehicle:** | Arup Laboratories, Inc. |
|---|---|
| **Contract Number:** | FSS Contract #:V797P-7211A (vendor is in the process of establishing a new FSS because this one expires 8/14/2019) |

(emphasis in original). Section 3.f.(i) of the Market Research Worksheet states: "[B]ased off of research and input from Pathologists on staff at the MEDVAMC Arup Laboratories offered the most comprehensive listing of tests and meet all applicable regulations [sic]."

The parties have stipulated that "[o]n May 1, 2019, Mr. Basten submitted a formal requisition request (No. 580-20-1-426-0007) to VISN 16's network contracting office (NCO 16) to procure anatomic pathology laboratory testing services for MEDVAMC from ARUP." The requisition request in the administrative record, dated May 1, 2019, indicates a total cost of $597,830.75, and lists the vendor as "ARUP LABORATORIES, INC." (capitalization in original).

The parties have stipulated that "[o]n August 9, 2019, the VA issued a [S]ources-[S]ought [N]otice/[R]equest for [I]nformation on the Federal Business Opportunities website, FBO.gov." The Sources Sought Notice/Request for Information No. 36C25619Q1353 in the administrative record (hereinafter, the RFI) lists the point of contact for MEDVAMC as contracting officer Kenny Holestin. The RFI states:

> The Michael E. DeBakey VA Medical Center (MEDVAMC) is pursuing a contract with a base year with four one-year options and an emergency six-month extension at the end of the last option year for anatomic pathology laboratory testing with Arup Laboratories. The Contractor must be certified by the College of American Pathologists (CAP) and perform testing in accordance with Clinical Laboratory Improvement Amendments (CLIA).
>
> BACKGROUND: Pathology and Laboratory Medicine tests are critical to patient care by providing objective data regarding disease states in patients to guide diagnosis and treatment. Modern medicine is not possible without timely and accurate testing from Pathology and Laboratory Medicine. As such, the Laboratory functions 24 hours a day, 365 days per year to support the clinical mission to service our Veteran patients.
>
> Laboratory Tests are requested by the Veterans' attending Physician who has the authority to prescribe the method of treatment to best satisfy the medical condition of his/her patient. The vast majority of tests are performed in our own laboratory. A subset of tests are performed as send out tests, mainly due to the fact that if a test is not commonly used it is more

economical to send out rather to [sic] establish and validate it continuously in our own laboratory. In certain cases tests depend on proprietary technology and can only be performed at a specific outside laboratory.

As the Chief of PLMS [Pathology and Laboratory Medicine Services] it is my responsibility to evaluate providers of send out testing. Testing is performed in Clinical Laboratory Improvement Amendments (CLIA)/The College of American Pathologists (CAP) certified laboratories. For each test the performance in terms of analytical sensitivity, linearity, reproducibility and analytical range is assessed. Clinical factors are assessed and for some test(s) rapid turnaround is critical in order to allow clinical staff to make treatment decisions in a clinically relevant timeframe. In certain circumstances this requires testing to be available 24 hours a day, 365 days a year. In addition, the method of transmitting results is evaluated for timeliness, adherence to patient privacy regulations and ease of use.

SCOPE: The MEDVAMC is requesting referral anatomic pathology laboratory testing from Arup Laboratories for the tests listed in the workbook titled "Anatomic Pathology Comprehensive Test List" included with the contracting packet.

The contractor shall provide and ensure safe, secure, and careful handling of the patient samples and the reporting of results in accordance with established guidelines from the Department of Veterans Affairs Handbook 6500, the College of American Pathologists (CAP), the Joint Commission on Accreditation of Health Care Organizations (JCAHO), guidelines established by VA Laboratory Service or as required to follow the Health Insurance Portability and Accountability Act of 1996 (HIPAA) during transportation.

PERIOD OF PERFORMANCE:
Base Period:    Oct. 1, 2019 to Sept. 30, 2020 with a cost of $597,830.75
Option Year 1:    Oct. 1, 2020 to Sept. 30, 2021 with a cost of $597,830.75
Option Year 2:    Oct. 1, 2021 to Sept. 30, 2022 with a cost of $597,830.75
Option Year 3:    Oct. 1, 2022 to Sept. 30, 2023 with a cost of $597,830.75
Option Year 4:    Oct. 1, 2023 to Sept. 30, 2024 with a cost of $597,830.75
                        Grand Total Cos [sic] of $2,989,153.75

GOVERNMENT'S RESPONSIBILITY: The send out laboratory personnel at the MEDVAMC will affix a label containing the patient's full name and full social security number to the specimen's container in order to ensure integrity of the information, place the specimen (that is being sent for processing) in a sealed tamper evident container and ship via UPS.

See attached document that has list of needed lab tests.

(capitalization in original). The base period and option year costs listed in the above-quoted text are the same as those which were established by the IGCE, discussed above. Attached to the RFI is a table with 611 line-items of laboratory tests and services. The table consists of the following four columns: (1) "**Mnemonic**;" (2) "**Test # &/or Code**;" (3) "**CPT Code(s)**;" and (4) "**Test Name**." (emphasis in original).

Under the heading titled: "**REQUESTED RESPONSES**," the RFI states:

The intent of this Request for Information is to establish sources to define the procurement strategy (e.g [sic] set-aside, sole source, unrestricted) for a solicitation that VA intends to post soon. Interested contractors are requested to respond in accordance with the following:

1. Please respond to this RFI if you can provide the exact brand name products listed in the table in the background section above. In the response please cite your business size status.

   a. If you have an existing GSA or VA, Federal Supply Schedule contract, please include the contract details in your response.

   b. DISTRIBUTORS: You must provide proof that you are an authorized distributor. VA does not accept grey market items.

2. Please respond to this RFI if you can provide supplies that may be determined EQUIVALENT to the products listed in the table in the background section above. Please provide details on the proposed EQUIVALENT products such as Manufacturer Name, Part Number, and Description.

   a. If you have an existing GSA or VA, Federal Supply Schedule contract, please include the contract details in your response.

   b. DISTRIBUTORS: You must provide proof that you are an authorized distributor. VA does not accept grey market items.

3. Please note that VA is particularly interested in determining the availability of Small Business Manufacturers. If your company is a small business manufacturer of potentially equivalent items, please respond to this RFI.

4. Vendors are requested to submit estimated market research pricing with their responses. The estimated pricing will be considered when determining the procurement strategy for the future solicitation. (e.g. if CO [contracting officer] determines that capable small businesses cannot provide fair and reasonable pricing, then the solicitation will not be set-aside).

5. Please note that if no responses to this notice are received, from either authorized distributors of the cited brand name nor from manufacturers marketing a potentially equivalent brand, then this action will be sole sourced to the manufacturer cited in the Background section above.

(capitalization and emphasis in original).

On August 12, 2019, the Senior Contract Manager for protestor MCI, Kathleen Henderson, sent an email to contracting officer Kenny Holestin, regarding the RFI's mention of ARUP Laboratories:

The purpose of this email is to inquire about the Sources Sought Notice 36C25619Q1353 posted on FBO on 9 August 2019. In reading the RFI, there are numerous times were [sic] you refer to "ARUP," a large business that appears to be the incumbent. Specifically, the RFI states, "SCOPE: The MEDVAMC is requesting referral anatomic pathology laboratory testing from Arup Laboratories for the tests listed in the workbook titled 'Anatomic Pathology Comprehensive Test List' included with the contracting packet."

Could you please clarify if this is a sources sought or an intent to sole source?

(capitalization in original). That same day, Mr. Holestin responded:

It is serving both. It is a sources sought to see if anyone else can provide the work the VAMC needs. If not we intent [sic] to sole source to the company who has informed us they can do the work. If your company is capable of fulfilling the VAMC's need within the statement of Work then please respond that you can. At that point we will determine who has responded and move forward with a competitive solicitation.

(capitalization in original).

On August 14, 2019, in an email sent by Kathleen Henderson, MCI submitted a response to the RFI. The body of Ms. Henderson's email states:

Mr. Holestin,

In response to the Sources Sought Notice, Solicitation 36C25619Q1353, Laboratory Testing, MCI, an interested SDVOSB [Service-Disabled Veteran-Owned Small Business], respectfully submits MCI RFI Response (to include estimated market prices), Capability Statement.

(capitalization in original). The MCI email from Ms. Henderson further states:

MCI Capability Statement addresses MCI's capability to provide Anatomic and Pathology Laboratory Testing; included in this email is
- MCI RFI Response (to include estimated market prices)
- MCI Capability Statement
- SDVOSB Certification (registered with the Department of Veterans Affairs Center for Veterans Enterprise VetBiz Registry located at https://www.vip.vetbiz.va.gov/)
- CAP Accreditation
- CLIA Accreditation

(capitalization in original). The Capability Statement provided in MCI's response to the RFI states:

> *MCI Diagnostic Center established in 1998, is a verified Service Disabled Veteran Owned Small Business/Veteran Owned Small Business (SDVOSB/VOSB) and accredited CAP and CLIA National Reference Laboratory capable of performing Laboratory Testing in support of the Michael E. DeBakey VA Medical Center (MEDVAMC) as **evidenced by the following:***

> Accredited Facility(ies): MCI has the necessary CAP and CLIA accredited facility(ies) and synergistic partnerships (local service agreements, subcontracts, etc.) with accredited laboratories to comply with the performance requirements. Visit www.mcidiagnostics.com for virtual tour of MCI Laboratory.

> Vendor Agreements/Partnerships: MCI has ample vendor resources to meet the anatomic and pathology Laboratory Testing requirements with the ability to obtain additional resources (e.g., supplies) as necessary through strategic partnerships and vendor agreements.

> Personnel Expertise: MCI has the necessary board-certified pathologists, technical skills and personnel expertise to meet Laboratory Testing requirements in support of MEDVAMC and VA Network Contracting Office (NCO) 16.

> Technical Equipment and Instrumentation: MCI is equipped with a Laboratory Information System (LIS) capable of' [sic] transmitting secure test results/reports and providing electronic ordering via secure online web portal. MCI is also equipped with all equipment and instrumentation required for complete laboratory testing/specimen analysis configured to meet requirements.

> Courier Services: MCI has established agreements with professional specimen courier services with proven records of reliability and accountability for deliveries to ensure integrity of the specimen.

(capitalization and emphasis in original). Under the "**SOCIO-ECONOMIC STATUS**" heading in MCI's Capability Statement, MCI's response to the RFI states: "Verified SDVOSB/VOSB," "[c]ertified SBA HUBZone," and "Minority-Owned, Disadvantage [sic] Business Enterprise." (capitalization and emphasis in original). Under the "**ACCREDITATIONS & CERTIFICATIONS**" heading of the Capability Statement, MCI's response states: "College of American Pathologist (CAP)," "Clinical Laboratory Improvement Amendment (CLIA)," "Clinical and Laboratory Standards Institute (CLSI)," and "COLA Accreditation." (capitalization and emphasis in original). Under the "**DIFFERENTIATORS**" heading, MCI's response states: "Established, strategic partnerships and local service agreements with vendors and suppliers of T-Spot kits," "ISO 15189-compliant for Clinical Medical Laboratory Services," "[w]eb-based client portal for online test and supply ordering," "[a]dvanced, state of the art lab technology such as handsfree processing and barcode driven protocols," and "[v]olume-based price discounts." (capitalization and emphasis in original). Under the "**CURRENT AND PAST PERFORMANCE**" heading of the Capability Statement, the response states: "Army National Guard," "Air Force National Guard," "USDA [United States Department of Agriculture] Job Corps," "Mississippi State Department of Human Services," and "Army Corps of Engineers." (capitalization and emphasis in original).

MCI's response to the RFI also includes a page which responds to some of the statements in the RFI under the "**REQUESTED RESPONSES**" heading, quoted above:

In response to the Sources Sought 36C25619Q1353, Testing, MCI Diagnostic Center, LLC ("MCI") submits the requested information as follows:

1. Please respond to this RFI if you can provide the exact brand name products listed in the table in the background section above. In the response please cite your business size status.

a. If you have an existing GSA or VA, Federal Supply Schedule contract, please include the contract details in your response.

**#1 MCI Response:** MCI can provide the anatomic and pathology tests identified in the RFI. MCI is a certified Service-Disabled Veteran-Owned Small Business (SDVOSB).

2. Please respond to this RFI if you can provide supplies that may be determined EQUIVALENT to the products listed in the table in the background section above. Please provide details on the proposed EQUIVALENT products such as Manufacturer Name, Part Number, and Description.

a. If you have an existing GSA or VA, Federal Supply Schedule contract, please include the contract details in your response.

**#2 MCI Response:** See #1 Response.

3. Please note that VA is particularly interested in determining the availability of Small Business Manufacturers. If your company is a small business manufacturer of potentially equivalent items, please respond to this RFI.

**#3 MCI Response:** MCI is a certified SDVOSB, HUBZone small business capable of providing the requested anatomic and pathology laboratory tests identified in the RFI.t [sic]

4. Vendors are requested to submit estimated market research pricing with their responses. The estimated pricing will be considered when determining the procurement strategy for the future solicitation. (e.g. if CO determines that capable small businesses cannot provide fair and reasonable pricing, then the solicitation will not be set-aside).

**#4 MCI Response:** For market research, MCI submits our estimated test prices under separate attachment. The RFI did not provide quantities so MCI is unable to determine the overall estimated price.

5. Please note that if no responses to this notice are received, from either authorized distributors of the cited brand name nor from manufacturers marketing a potentially equivalent brand, then this action will be sole sourced to the manufacturer cited in the Background section above.

**#5 MCI Response:** MCI submits our response to this notice as a fully capable, certified SDVOSB with fair market pricing for the Laboratory Testing, and contends that the manufacturer (ARUP) cited in the Background section is not the only responsible source capable of performing this requirement.

(capitalization and emphasis in original). MCI's response to the RFI also includes a list of laboratory tests and services which the parties have stipulated is "the requested schedule of its [MCI's] estimated prices for each of the anatomic pathology laboratory testing services to be provided under an awarded contact [sic]."

The administrative record also includes an RFI response from another Service-Disabled Veteran-Owned Small Business, [redacted]. The parties have stipulated that "[redacted]'s response identified the company as an SDVOSB . . . and included the requested schedule of its estimated prices for each of the anatomic pathology laboratory testing services to be provided under an awarded contact [sic]." In addition, the parties

have stipulated that a "third SDVOSB, [redacted], also timely responded" to the RFI, although [redacted] did not ultimately respond to the Solicitation.

The parties have stipulated that on "August 21, 2019, contracting officer Kenny Holestin prepared a market research report finding that 'the rule of two [in 38 U.S.C. § 8127(d)] ha[d] been met,' based on a search of the VA's Vendor Information Pages (VIP) database and the three responses he received from SDVOSBs to the sources-sought notice/request for information." (alterations in original). Under the "**Requirement Title**" heading, which is the heading for the entire Market Research Report, the Market Research Report states: "ARUP Reference Laboratory Testing 580-20-1-426-0007."

(emphasis in original). Section 5 of the Market Research Report states:

> Market Research Findings: On August 9, 2019 an [sic] sources sought was posted to FBO.gov with a closing date of August 23, 2019. The intent of the sources sought was to determine who could provide brand name lab testing to fit the VAMC's need. Upon closing of the sources sought, three SDVOB [sic] responded stated they are able to provide the needed testing. (MCI, [redacted], & [redacted]). Upon review of the VIP search all three vendors are confirmed SDOVSB's [sic]. With the above stated the rule of two has been met, a RFQ will be set a side [sic] for SDVOSB.

In Section 7, the Market Research Report indicates a "Market Price" of $597,830.75.

On September 4, 2019, contracting officer Kenny Holestin and senior contract manager for MCI, Kathleen Henderson, exchanged email correspondence. Mr. Holestin asked: "If you are awarded a contract for Oct [sic] 1, 2019. [sic] How long before you can start taking our lab tests in for processing?" Ms. Henderson responded: "If awarded prior to October 1, and we could complete our kick-off call, onboarding and supply request, We [sic] would be able to perform laboratory testing October 1, 2019." Mr. Holestin replied: "That's problem [sic] we can't award prior to Oct [sic] 1, because of funding in the new year." Ms. Henderson replied: "[T]hat's not a problem! We can start October 1, 2019. [T]he laboratory is ready to receive samples any day, we just need to overnight shipping label and then start the training and kick-off call." The administrative record contains no further correspondence between Mr. Holestin and Ms. Henderson.

Solicitation No. 36C25619Q1507

The parties have stipulated that "[o]n September 12, 2019, the VA posted Solicitation No. 36C25619Q1507 (Solicitation or RFQ) to FBO.gov, inviting quotations from SDVOSBs to provide anatomic pathology laboratory testing services to MEDVAMC beginning on October 1, 2019." Under the heading titled: "**Statement of Work**," the Solicitation provides that the following criteria "shall" be met:

> a. Contractor shall provide a written response addressing each of the minimum requirements of the solicitation. Appropriate supporting

documentation and/or shall [sic] be submitted to demonstrate ability to meet or exceed the minimum requirements of this solicitation.

b. Contractor shall provide a copy of their current CLIA Certificate of Accreditation containing the appropriate specialties/subspecialties to indicate federal certification of compliance with CLIA requirements.

c. Contractor shall provide a copy of their current CAP Accreditation Certificate.

d. Contractor shall provide a copy of their current CAP Test Activity Menu reflective of all tests they are currently accredited to perform demonstrating laboratory's ability to perform the tests.

e. Contractor shall provide written documentation proving that they have successfully completed method performance validation &/or verification studies as appropriate for any 10 tests (listed within the attached item list) signed by the Laboratory Director.

f. Contractor shall provide a copy of their standard test catalog (electronic format preferred) of all reference laboratory testing services available.

At a minimum the test catalog shall include:

• Ordering Code (contractor's identification code)

• LOINC Code (Logical Observation Identifier Names and Codes)

• CPT Code

• Test Name/Synonyms

• Test Methodology

• Specimen Types

• Specimen collection and handling requirements

• Test result interpretation or interpretive remarks

• Maximum Turnaround Time (TAT), excluding time required for repeat assay. For those tests offered on a STAT basis, TAT should be listed separately.

• Assay schedule- must state "MWF" for tests set up Monday, Wednesday and Friday; "MTWTF" for Monday through Friday; "TT" for Tuesday and

Thursday; "Daily" for every day.

• Assay Method

• Reference Ranges

g. Sample patient report format for the same 10 tests that were submitted for line item "e" demonstrating all required report elements are listed.

• Each test report shall include as a minimum: Patients name and identification number (social security number)[,] Physician's name (if supplied)[,] Test Accession Number assigned by facility[,] Facility name[,] Patients location clinic/ward (if supplied)[,] Date/Time specimen received in reference lab[,] Test ordered[,] Date/Time of specimen collection (if available)[,] Date test completed[,] Test result[,] Flagged abnormal[,] Reference range[,] Testing laboratory specimen number[,] Name, address and CLIA number of Contractor testing facility[,] Type of specimen[,] Any additional comments related to test provided by submitting labs[,] Any other information the laboratory has that may indicate a questionable validity of test results[,] Unsatisfactory specimen shall be reported with regard to its unsuitability for testing

h. Contractor shall provide a copy of their laboratory's standard operating procedure (SOP) for performance of proficiency testing surveys and the performance of alternative performance assessments.

i. Contractor shall provide a copy of their results of external or alternative performance assessments for the same 10 tests that were submitted for line item "e & g".

j. Contractors shall provide Past Performance information for three contracts (two must be from VA Medical Centers outside VISN 16) performed within the last five years with similar scope and complexity as this effort. The attached Past Performance questionnaire shall be used. Please have each reference complete the form and return it directly to insert CO name.

k. Contractor shall provide written attestation that they have successfully completed the method performance validation &/or verification studies for all of the tests listed within the item list.

- See attached item list to input your pricing.

(capitalization and emphasis in original).

Attached to the Solicitation is a table with 611 line-items of laboratory tests and services (the Solicitation Table). The parties have stipulated that the Solicitation Table was "adapted from the April 2019 IGCE." Unlike the April 2019 IGCE, however, this table in the Solicitation does not include columns for "Price," or "Extended Amount," although it does contain the same two comments that were included at the bottom of the IGCE, which state: "Base year needs to be about $600K," and "Each of the option years should be appoximately [sic] the same cost and usage (minimal fluctuation)."

Section E.1 of the Solicitation, which incorporates FAR § 52.212-1 (2018), states: "[a]s a minimum, offers must show . . . [a] technical description of the items being offered in sufficient detail to evaluate compliance with the requirements in the solicitation. This may include product literature, or other documents, if necessary." Id. The FAR at § 52.212-1(b)(11) states that "[o]ffers that fail to furnish required representations or information, or reject the terms and conditions of the solicitation may be excluded from consideration." Id. The FAR at § 52.212-1(g) states:

> (g) *Contract award (not applicable to Invitation for Bids)*. The Government intends to evaluate offers and award a contract without discussions with offerors. Therefore, the offeror's initial offer should contain the offeror's best terms from a price and technical standpoint. However, the Government reserves the right to conduct discussions if later determined by the Contracting Officer to be necessary. The Government may reject any or all offers if such action is in the public interest; accept other than the lowest offer; and waive informalities and minor irregularities in offers received.

Id. (emphasis in original).

Section E.2 of the Solicitation, which incorporates FAR § 52.212-2 (2018), states:

> (a) The Government will award a contract resulting from this solicitation to the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered. The following factors shall be used to evaluate offers:
>
> Price, Technical and past performance, when combined equal 100%[.]

The parties further stipulated that "[t]he Solicitation required offerors to submit their quotations to Mr. Holestin by September 20, 2019," and that "[t]he Solicitation identified Reuben A. Zepeda as the contracting officer" for the Solicitation.

MCI's Proposal

The parties have stipulated that "[o]n September 20, 2019, the VA received two responses to the Solicitation: one from [redacted] and another from MCI," and that "[b]oth [redacted] and MCI quoted total pricing below the total pricing projected by the IGCE." As indicated above, the third company which had responded to the RFI, [redacted], did not

submit a response to the Solicitation. Under the "**INTRODUCTION**" heading, MCI's proposal states:

> MCI Diagnostic Center, LLC ("MCI") submits our response to the Request for Quote, Laboratory Testing. [sic] in support of Department of Veterans Affairs. Founded in 1998, MCI has a proven track record of providing excellent strategic management, and laboratory services to a wide range of federal, state, and commercial businesses. As a certified Service-Disabled Veteran-Owned Small Business (SDVOSB) and certified Historically Underutilized Business Zone (HUBZone) we create exceptional value for our clients not only through implementation of industry-wide best healthcare laboratory practices but also for meeting DoD small business goals. MCI has been awarded many accreditations recognizing our standard of excellence and commitment to provide the best services to the veterans we serve.

(capitalization and emphasis in original). Under the heading titled: "**FACTOR 1 – TECHNICAL**," MCI's proposal states:

> It is MCI's intent to bring quality testing for Laboratory Testing and technical expertise to support the contract. MCI is committed to the provision of high-quality patient care delivered by experienced, qualified healthcare providers. MCI will provide the requisite technical expertise for performing laboratory testing., [sic] as requested.

(capitalization and emphasis in original). Under the heading titled: "**SCOPE OF SERVICE**," MCI's proposal states:

> MCI will provide all labor, transportation/courier of specimens, management, supplies, materials, customized forms, equipment, administration, consultative services, and reporting of specimen test results necessary to meet the performance requirements.

(capitalization and emphasis in original). Under the heading titled: "**CONTRACT STANDARDS FOR LABORATORY TESTING**," MCI's proposal states that "MCI will provide Laboratory Testing our [sic] qualified laboratory partners and will continue to actively participate in various study of laboratory testing, with a goal of enhancing clinical patient care." (capitalization and emphasis in original). MCI's proposal also states that "MCI will provide all equipment, materials, and supplies necessary to perform laboratory testing." Under the heading titled: "**LICENSING AND ACCREDITATION**," MCI's proposal states:

> MCI holds accreditation certificates and licenses and manufactures agreement [sic] required for this contract and comply with all applicable industry standards, Federal, State and local laws necessary for performance of this contract. MCI Laboratory is certified as meeting the

Clinical Laboratory Improvement Act (CLIA), we are inspected and accredited by the Laboratory Accreditation Program (LAP) from the College of American Pathologists (CAP) and the Commission of Office Laboratory Accreditation (COLA) with deemed status from the Center for Medicare and Medicaid Services (CMS), and other state regulatory agencies as mandated by federal and state statutes. In addition, to visually survey our laboratory, please go to www.mcidiagnostics.com for "A Virtual Tour of Our Lab."

MCI included the following certificates as attachments of our proposal:

*Attachment #1 – College of American Pathologists (CAP)*
*Attachment #2 – Clinical Laboratory Improvement Amendments (CLIA)*
*Attachment #3 – Commission on Office Laboratory Accreditation (COLA)*

(capitalization and emphasis in original). MCI's CLIA Certificate of Accreditation indicates the following lab certifications and associated effective dates:

| LAB CERTIFICATION (CODE) | EFFECTIVE DATE | LAB CERTIFICATION (CODE) | EFFECTIVE DATE |
|---|---|---|---|
| BACTERIOLOGY (110) | 11/26/2018 | ANTIBODY ID (540) | 11/26/2018 |
| MYCOBACTERIOLOGY (115) | 11/26/2018 | COMPATIBILITY TESTING (550) | 11/26/2018 |
| MYCOLOGY (120) | 11/26/2018 | HISTOPATHOLOGY (610) | 11/26/2018 |
| PARASITOLOGY (130) | 11/26/2018 | ORAL PATHOLOGY (620) | 11/26/2018 |
| VIROLOGY (140) | 11/26/2018 | CYTOLOGY (630) | 11/26/2018 |
| GENERAL IMMUNOLOGY (220) | 11/16/2017 | | |
| ROUTINE CHEMISTRY (310) | 05/16/2016 | | |
| URINALYSIS (320) | 05/16/2016 | | |
| ENDOCRINOLOGY (330) | 11/16/2017 | | |
| TOXICOLOGY (340) | 07/09/2014 | | |
| HEMATOLOGY (400) | 11/28/2017 | | |
| ABO & RH GROUP (510) | 11/26/2018 | | |
| ANTIBODY NON-TRANSFUSION (530) | 11/26/2018 | | |

In total, MCI's proposal includes three tables of laboratory tests and services. One table (the MCI Cost Proposal Table) contains 611 line-items of laboratory tests and services which appear to be the same the laboratory tests and services provided in the Solicitation Table.[4] Like the Solicitation Table, the MCI Cost Proposal Table appears to be adapted from the IGCE, in that it states "**INDEPENDENT GOVERNMENT COST ESTIMATE**" immediately above the table, contains the date, "4/25/2019" immediately below the table, and includes the same two comments in that were in the IGCE: "Base year needs to be about $600K," and "[e]ach of the option years should be approximately [sic] the same cost and usage (minimal fluctuation)." The MCI Cost Proposal Table, however, also includes two additional columns in addition to the five which are in the Solicitation Table. The two columns are titled, respectively: "**MCI $**" and "**Total MCI $**." (emphasis in original). The values in the "**Total MCI $**" column are found by multiplying

---

[4] In their submissions to this court, there is no indication from the parties that there is a difference between the laboratory tests and services listed in the Solicitation Table and the MCI Cost Proposal Table, although Mr. Basten, who, as discussed below, conducted the evaluation of MCI's proposal, identified that the order of the laboratory tests and services in in the MCI Cost Proposal Table differed from the Solicitation Table.

the amount listed in the associated "**MCI $**" column by the amount listed in the associated "**Est. Qty**" column. (emphasis in original). The bottom of the MCI Cost Proposal Table lists a "**Total Cost of Base Period**" equal to $[redacted], and a "**Grand Total Cost of Base + 4 Option Periods**" equal to $[redacted]. (emphasis in original).

MCI's proposal contains a second table, also consisting of 611 line-items of laboratory tests and services (the PS-TNT Table). In the PS-TNT Table, MCI proposes its "Production Schedule," and "Turnaround Times" for each laboratory test and service listed. In the "Production Schedule" column, it lists, for example, "M-W-Th-F," indicating that that MCI proposes to perform the associated test on any given Monday, Wednesday, Thursday or Friday. In the "Turnaround Times" column, it lists, for example, "5 - 7 Days," to indicate that MCI proposes to provide the results of a given test in such a timeframe.

Under the heading titled: "**CAP TEST ACTIVICTY** [sic] **MENU**," MCI's proposal provides a third table which consists of 211 CAP-certified test activities (the CAP Test Activity Menu). (capitalization and emphasis in original). Immediately above the CAP Test Activity Menu, the following information is provided:

| MCI Diagnostic Center, LLC (CAP# 8871920) |
| --- |

| Core Laboratory (Section ID: 1858271) - Activities |
| --- |

The CAP Test Activity Menu includes each listed test activity's respective discipline and subdiscipline. The following nine disciplines provided in the Test Activity Menu are: "Anatomic Pathology," "Chemistry," "Cytopathology," "Hematology," "Histocompatibility Testing," "Immunology," "Microbiology," "Transfusion Medicine/Blood Bank," and Urinalysis." The following twenty subdisciplines provided in the Test Activity Menu are: "Anatomic Pathology Processing," "Autopsy Pathology," "Blood Gases," "Chemistry," "Special Chemistry," "Toxicology," "Cytology Processing," "Cytology Screening," "Coagulation," "Hematology," "HLA Serology," "Immunology," "Bacteriology," "Molecular Microbiology," "Mycobacteriology," "Mycology," "Parasitology," "Virology," "Immunohematology," and "Urinalysis."

Under the heading titled: "**LABORATORY REPORTS**," MCI's proposal states:

Each test report will include, at minimum, the following information:

- Patient's name and/or identification number
- Physician's name, if provided
- Medical record number or laboratory accession number
- Submitting facility name
- Patient's location (clinic/ward)
- Test ordered;
- Date/time specimen was collected
- Date/time test completed;

- Date of birth;
- Social security number or a second identifier;
- Gender
- Test result;
- Reference intervals/ranges;
- Toxic and therapeutic ranges, as applicable;
- Flagged abnormal test results;
- Reference laboratory specimen number;
- Testing Laboratory name, address & CLIA number
- Type of specimen
- Any other information the laboratory has that may indicate a questionable validity of test results;
- Unsatisfactory specimens will be reported with documentation supporting its unsuitability for testing;
- Critical results addressed; and,
- Reasons for test request rejection, if rejected laboratory will notify facility within 24 hours of receipt of specimen.

(capitalization and emphasis in original).

MCI's proposal also includes ten sample patient reports. For instance, the sample patient report for the test, Thyroglobulin, provides the following information:

7024 S. UTICA AVE
TULSA, OK 74136
918-895-6657
CLIA Number: 37D2011460
Director: Dr. Sherrita Wilson M.D.



MCI DIAGNOSTIC LABORATORY

Report Status: Final

| Specimen Information | | Patient Information | | Ordering Physician | |
|---|---|---|---|---|---|
| Accession: | 1909190011 | PATIENT, TEST | | Test, Physician MD | |
| Collected: | 09/18/2019 12:49 | DOB: | 10/10/1965 | Client Information | |
| Received: | 09/19/2019 12:49 | Age: | 53 | TEST CLINIC | |
| Reported: | 09/19/2019 01:03 | Gender: | Female | 123 Test Street | |
| | | ID: | test | San Antonio, TX 78260 | |
| | | | | 1111111111 | |

| Procedure | Normal | Abnormal | Units | Ref. Range |
|---|---|---|---|---|
| PATHOLOGY - IHC | | | | |
| THYROGLOBULIN | | Positive | | [ Negative ] |
| Thyroglobulin Comments: | | | | |

Received unstained slides. This test is performed on formalin-fixed, paraffin-embedded tissue.

Laboratory Director's Signature:



Thyroglobulin: POSITIVE
Tumor Stained: 80%

20

In the attachment titled: "**VALIDATION & VERIFICATION REPORT**," MCI's proposal includes "Antibody Validation Log[s]" for the same ten tests for which it provided sample test reports. (capitalization and emphasis in original). For example, the Antibody Validation Log for the above test, Thyroglobulin, provides as follows:

## Antibody Validation Log
## Antibody Name and Clone:  Thyroglobulin (2H11+6E1)
## Manufacturer and Order ID: Roche 05267820001

| No. | New Antibody ID | Result | Expected Result | Correlation Y/N |
|---|---|---|---|---|
| 1 | Thy-20 | POS | POS | Y |
| 2 | Thy-19 | POS | POS | Y |
| 3 | Thy-18 | POS | POS | Y |
| 4 | Thy-17 | POS | POS | Y |
| 5 | Thy-16 | POS | POS | Y |
| 6 | Thy-15 | POS | POS | Y |
| 7 | Thy-14 | POS | POS | Y |
| 8 | Thy-13 | POS | POS | Y |
| 9 | Thy-12 | POS | POS | Y |
| 10 | Thy-11 | POS | POS | Y |
| 11 | Thy-10 | NEG | NEG | Y |
| 12 | Thy-9 | NEG | NEG | Y |
| 13 | Thy-8 | NEG | NEG | Y |
| 14 | Thy-7 | NEG | NEG | Y |
| 15 | Thy-6 | NEG | NEG | Y |
| 16 | Thy-5 | NEG | NEG | Y |
| 17 | Thy-4 | NEG | NEG | Y |
| 18 | Thy-3 | NEG | NEG | Y |
| 19 | Thy-2 | NEG | NEG | Y |
| 20 | Thy-1 | NEG | NEG | Y |
|  |  |  |  |  |
|  |  |  |  |  |
| % Compliance |  |  |  | 100% |
| Pass/Fail |  | PASS |  |  |

_____

**Laboratory Director Signature**

Aug 2, 2019
_____
**Date**

In the attachment titled: "**PROFICIENCY TESTING SOP** [Standard Operating Procedure]," MCI's proposal provides the following:

**PURPOSE:**
The Laboratory maintains enrollment and participation in Proficiency Testing (PT) programs for all regulated analytes.

**POLICY:**
The Proficiency Testing program can be provided by the College of American Pathologists (CAP) or American Proficiency Institute (API) and should be of similar complexity to the testing performed in the laboratory. All results and paperwork generated from proficiency testing will be reviewed by the laboratory director or designee and returned in a timely manner. All graded results will be evaluated with corrective actions implemented for unsatisfactory results. Documentation of these testings' [sic] and reviews will be maintained for at least two years.

**PROCEDURES:**
Enrollment will be established and maintained periodically for all regulated analytes that are tested in the Laboratory and any additions that may occur. Each of the regulated analytes will have the PT performed internally and appropriately by rotating testing personnel and those personnel will sign the provided attestation pages signifying that they have performed the testing in parallel manner to live patent sample testing with results being returned promptly to the PT institute for grading. These results will be submitted to the grading institute without outside communication of the testing or the results and will not be referred to another laboratory.

Graded results will be reviewed by the involved testing personnel, the Laboratory Supervisor, the Technical Supervisor and the Laboratory Director. All unsatisfactory grades received by the Laboratory will be identified and investigated by the appropriate Laboratory personnel. Remediation will involve identifying the issue to have caused the unsatisfactory results, implementing appropriate corrective action in a timely manner, and analyzing the effect, if any, that would impact patients sample testing. If lack of training causes the PT failure, additional training will be assigned for those testing personnel by experienced testing personnel. If equipment failure causes the PT failure, internal maintenance will take place or external service will be scheduled. If the procedures stated by the manufactures [sic] and maintained in the instrument testing policies were not followed correctly, testing personnel will be re-trained until competency is satisfactory. If calibrations or quality control results being outside of the acceptable range causes the PT failure, the quality control policies will be reviewed and improved. If there is an impact on patient testing determined, corrective actions will be implemented. Consultation will be sought for remedies of the causes of the PT failures. All corrective actions taken will be documented and reviewed by the Laboratory Director. If CAP requires a cease testing of any analytes due to PT failures, the testing will not be performed in the Laboratory for a minimum of six months

and the laboratory will demonstrate at least two consecutive satisfactory PT testing events and receive approval from the CAP to resume testing. MCI will not receive any PT from any other laboratory and will notify CMS of any such occurrence.

When PT results are returned un-graded, the Laboratory will perform a self-evaluation with the provided target results and allowable range from the PT institute for self-determination of accuracy. The PT results could be returned un-graded if there weren't enough participation of peer groups, there was no consensus among the participating peer groups, or if the Laboratory failed to provide the PT results from lack of inventory, oversight, or submitting after the due date.

For laboratory testing of regulated analytes that are not offered PT programs, an external split-specimen study will occur. At least five specimens will be tested and referenced out for comparison results periodically.

(capitalization and emphasis in original).

MCI's proposal also includes an Attestation Form, which states:

**Attestation Statement**

The validation testing activities are based on the CLIA Regulations that became effective on April 24, 2003 (42 CFR Part 493). The official CLIA program provisions contained in relevant law, regulations and rulings have been reviewed for a comprehensive description of the requirements pertaining to performance specification verification.

• Data collected by Laboratory Personnel has been organized into output tables based on the minimum guidelines specified by CLIA.
• Laboratory Personnel have obtained previously tested patient specimens, that are within the indications as listed on the method manufacturer's package insert.
• Results are expressed in terms of imprecision.
• An equal number of known positive patient specimens and known negative patient specimens from the laboratory's current method were tested.
• We identified TP (true positive), FP (false positive), TN (true negative) and FN (false negative) for the new method compared to the current method allowing for calculation of overall percent agreement, positive percent agreement, negative percent agreement, negative predicative value and positive predicative value.
• Overall percent agreement, positive percent agreement and negative percent agreement and predictive values have been calculated and are concordant.
• External results Performance assessment will be performed and our subcontractors have external data that could be provided upon request.

> **MCI provides attestation that we fully meet the requirements as being accredited by the College of American Pathology (CAP) and Certified by (CLIA) see attachments to run all the listed test** [sic]**, We** [sic] **have successfully completed the method performance validation and/or verification on a** [sic] **many of the test** [sic] **listed. Our Partner laboratories that we work with have been validated on all of the testing that we currently are not.**

(capitalization and emphasis in original). MCI's Attestation Form is signed by its Laboratory Director, Sherrita Wilson, M.D., and three "Testing Personnel." (capitalization in original).

Finally, MCI provides information on past performance. MCI's proposal states:

> MCI submits recent and relevant contracts for the same or similar items and other references (including contract numbers, point of contact with telephone numbers and other relevant information in accordance with FAR 52.212-1(b)(10):
>
> **Contract Number #1: W912JB-18-P-0079, Michigan Army National Guard**
>
> > a. Description/Scope of Services: Medical laboratory testing and analysis services in support of Army National Guard, State of Michigan. Scope includes providing personnel, equipment, supplies, and administration necessary to perform medical laboratory testing services.
> > b. Period of Performance: 09/26/2018 – 09/25/2019
> > c. Contract Price: $59,482.00
> >
> > . . .
> >
> > g. How pervious effort is similar in scope and magnitude to those specified in this requirement: This effort is similar in scope and magnitude to those specified in this requirement as MCI provides all personnel, supervision, services, and supplies necessary to perform reference laboratory testing services for the Michigan Army National Guard. This includes courier services, providing supplies and equipment, and performing pre-analytic, analytic, and post-analytic laboratory testing services.
>
> **Contract Number #2: 1282A7-18-A-0009, USDA Forest Services, Job Corps Center**
>
> > a.   Description/Scope   of   Services:   Blanket   Purchase

Agreement (BPA) for medical laboratory testing and analysis services in support of USDA Forest Service, Job Jobs Center (25 locations). Scope includes providing personnel, equipment, supplies, and administration necessary to perform medical laboratory testing services.
b. Period of Performance: 09/24/2018 – 09/22/2023
c. Contract Price: $250,000.00 (maximum of BPA)

. . .

f. How previous effort is similar in scope and magnitude to those specified in this requirement: This effort is similar in scope and magnitude to those specified in this requirement as MCI provides all personnel, supervision, services, and supplies necessary to perform reference laboratory testing services for the USDA Forest Services Job Corps Centers. This include courier services, providing supplies and equipment, and performing pre-analytic, analytic, and post-analytic laboratory testing services.

**Contract Number #3: W912EE-18-P-0077, US Army Corps of Engineer, Vicksburg, MS, District Headquarters**

a. Description/Scope of Services: Medical laboratory testing and analysis services in support of US Army Corps of Engineer, District Headquarters. Scope includes providing personnel, equipment, supplies, and administration necessary to perform medical laboratory testing services.
b. Period of Performance: 10/01/2018 – 09/30/2023
c. Contract Price: $50,000

. . .

f. How previous effort is similar in scope and magnitude to those specified in this requirement: This effort is similar in scope and magnitude to those specified in this requirement as MCI provides all personnel, supervision, services, and supplies necessary to perform select lab testing services for the MVK Vicksburg, MS location. This includes courier services, providing supplies and equipment, and performing pre-analytic, analytic, and post-analytic laboratory testing services.

(emphasis in original).

Cancellation of the Solicitation

On September 25, 2019, Peter Basten, the Program Analyst for the Michael E. DeBakey VA Medical Center, who had developed the pre-Solicitation documents, and who, as discussed below, conducted an evaluation of MCI's proposal, sent an email to contracting officer Kenny Holestin, stating: "Please cancel the ARUP laboratory reference contracting packet with a funding document of 580-20-1-426-0007."[5] That same day, September 25, 2019, Mr. Holestin emailed MCI's Director of Operations, Colleen Payne, that the "requirement has been canceled."[6]

---

[5] This is another example of the VA referencing ARUP Laboratories during the procurement process.

[6] In an email to Mr. Holestin, also on September 25, 2019, MCI's Director of Operations, Ms. Payne, responded: "This is the 3rd solicitation that has been canceled this week because we won it! I can't keep fighting, when the entire system is against any small business and still Quest and everyone is allowed to continue to hurt a veteran company." Also on September 25, 2019, Ms. Payne sent an email to Alan Swygert, Director of VHA Vendor Relations, stating:

Do you have time for a call today?

Most importantly is the email from yesterday, there [sic] wanting to exclude out of the SDVOSB set aside, and it's being conducted without all the information.

We're once again bringing in more equipment to accommodate this award and now the [sic] Quest sent another letter Monday, stating we're not authorized they believe we're not again a supplier. . . .

VISN 16 is making decisions on 4 $150 k simplified acquisitions. We continue to do everything right and just want to serve and continue to serve our veterans.

(capitalization in original). Later on September 25, 2019, Mr. Swygert responded that he was "in the middle of meeting with the VISN 16 Contracting Staff and the National Director of Laboratory Service." On September 26, 2019, Ms. Payne again emailed Mr. Swygert, stating: "I would like to know what happen [sic] with the Meeting with VISN16 yesterday! . . . They cancelled all the solicitations and there were not just 2 SDVOSB's there were more, and NOW once again we have spent another 70K and no solicitation. No award and no contract." (capitalization in original). Then, on September 26, 2019, Mr. Swygert responded:

As far as the actions being taken by our local and VISN Procurement Professionals now, I think the better description (visit-wise and from a solicitation-perspective) might be that they're merely delaying their efforts

Also on September 26, 2019, in an internal email from Peter Basten to Kenny Holestin, Mr. Basten wrote:

> Attached is my review [of MCI's and [redacted]'s proposals] and formal reply. I would like to point out a couple of interesting observations:
>
> - The responses provided are very similar and the verbiage in the Attestation Statement provided with both submissions is identical.
>
> - The production schedule and turnaround time for both labs is the same.
>
> - Both of their pricing tables in the exact same order and not in the order that we provided.

Attached to Mr. Basten's email are his evaluations of both MCI's and [redacted]'s proposals. Both evaluations respond in bullet-point form to the requirements in the

---

> in an attempt to facilitate a WIN-WIN-WIN solution for all stakeholders.
>
> With that said, I, too echo the sentiment of our Contracting Officials and apologize for any inconvenience that these actions may have caused you.
>
> But, unfortunately, these RFQs were canceled due to the significant anomalies discovered with the solicitations. . . .
>
> Per our previous conversation, I'm still formulating a team of Clinical Subject Matter Experts (to include the VA Director of Laboratory Services and the Integrated Product Team Leads for Laboratory Services) to physically examine your capabilities and discuss any concerns/issues (from both perspectives).
>
> However, these clinical professionals are not available until late October but are committed to visiting your facility and conversing with your clinical experts.

(capitalization in original). No further information was provided to MCI regarding the reason for the cancellation. The court notes, however, that in the above-quoted correspondence, Ms. Payne appears to attribute certain questionable conduct on the part of Quest Diagnostics, Inc., a nation-wide laboratory test and service provider. Protestor's original complaint included allegations against Quest Diagnostics, Inc. Protestor's amended complaint, however, removed any mention of Quest Diagnostics, Inc., as well as any allegations that could be construed as bad faith on the part of the VA. The court also notes that, although Ms. Payne mentions additional solicitations in the above correspondence, the administrative record, as well as the parties' submissions to this court, do not involve any solicitation other than Solicitation No. 36C25619Q1507, the Solicitation at issue in the above-captioned bid protest.

Statement of Work section of the Solicitation, discussed above. Mr. Basten's evaluation of MCI's proposal states:

> **MCI Diagnostic Center:** After analyzing the RFQ and research done on their website; several question [sic] & concerns arise related to integrity of services provided and the ability of MCI to provide them. Below is a detailed breakdown:
>
> - **Section B.2 Statement of Work: a. Contractor shall provide a written response addressing each of the minimum requirements of the solicitation. Appropriate supporting documentation and/or** [sic] **shall be submitted to demonstrate ability to meet or exceed the minimum requirements of this solicitation.**
> - **Section B.2 Statement of Work: b. Contractor shall provide a copy of their current CLIA Certificate of Accreditation containing the appropriate specialties/subspecialties to indicate federal certification of compliance with CLIA requirements.**
>   - Molecular Pathology not identified on CLIA certificate
>   - Anatomic Pathology not identified on CLIA certificate
> - **Section B.2 Statement of Work: c. Contractor shall provide a copy of their current CAP Accreditation Certificate.**
>   - CAP Accreditation Certificate provided however based on Test Activity Menu provided MCI is not CAP certified to perform all of the tests required in this RFQ. Not CAP Accredited for Molecular Pathology.
> - **Section B.2 Statement of Work: d. Contractor shall provide a copy of their current CAP Test Activity Menu reflective of all tests they are currently accredited to perform demonstrating laboratory's ability to perform the tests.**
>   - CAP Test Activity Menu does not include all of the required testing.
> - **Section B.2 Statement of Work: f. Contractor shall provide a copy of their standard test catalog (electronic format preferred) of all reference laboratory testing services available.**
>   - In the RFQ response MCI provides the secure link to website Link: https://www.mcidiagnostics.com
>   - The test directory contains an extensive test listing however the following required elements are not provided:

- LOINC codes
- Synonyms
- Test methodology
- Maximum turnaround time
- Assay schedule
- Reference ranges
  - o Test ID for tests in the MCI test directory does not match Test ID provided in the price schedule
  - o Not all RFQ required tests are in the MCI test directory
- **Section B.2 Statement of Work: g. Sample patient report format for the same 10 tests that were submitted for line item "e" demonstrating all required report elements are listed.**
  - o S**ample r**eports provided do not contain both the VA Accession number and MCI Accession number
- **Section B.2 Statement of Work: h. Contractor shall provide a copy of their laboratory's standard operating procedure (SOP) for performance of proficiency testing surveys and the performance of alternative performance assessments.**
  - o A copy of the required procedure was provided however section addressing performance of alternative performance assessments does not meet CAP requirements.
- **Section B.2 Statement of Work: i. Contractor shall provide a copy of their results of external or alternative performance assessments for the same 10 tests that were submitted for line item "e & g".**
  - o Information not provided
- **Section B.2 Statement of Work: k. Contractor shall provide written attestation that they have successfully completed the method performance validation &/or verification studies for all of the tests listed within the item list.**
  - o Although MCI attests the following "we have successfully completed the method performance validation and/or verification on a many of the test listed. Our Partner laboratories that we work with have been validated on all the testing that we currently are not", they are not CAP accredited to perform all of the tests required.
- **Additional Concerns**
  - o Page 9 refers to laboratory partners (how much of the work are they doing)
  - o Website test directory contains many tests for which MCI is not CAP accredited to perform
  - o Difficulty navigating on line test menu
  - o Inconsistent information
  - o Unable to determine what percentage of the work MCI will be performing and no information provided regarding

subcontracting or a subcontracting plan
o  Not enough information to determine what tests were
   performed for pervious contracts.

**Based on the information provided in response to the RFQ and from
MCI's website; MCI did not meet all the technical requirements in the
RFQ. The MCI quotation is technically unacceptable.**

(capitalization and emphasis in original). The parties also have stipulated that, similar to
the evaluation of MCI's proposal, Mr. Basten's "formal technical evaluation document
identified numerous deficiencies in [redacted]'s quotation, spanning multiple
requirements expressed in the Solicitation." Although Mr. Basten's evaluation of the two
companies' proposals were similar in a number of respects, Mr. Basten also identified
deficiencies in [redacted]'s proposal that he did not identify for MCI's poroposal.[7]

Although contracting officer Kenny Holestin emailed MCI and [redacted] on
September 25, 2019 informing them that the Solicitation had been canceled, the
Solicitation was not officially canceled until October 10, 2019. On October 10, 2019, an
amendment to the Solicitation was completed and issued by Reuben Zepeda, a
contracting supervisor for the VA. The subject of the amendment states: "Solicitation
36C25619Q1507 has been CANCELED." (capitalization in original).

Procedural History

After the cancellation, MCI filed the above-captioned bid protest in the United
States Court of Federal Claims, challenging the cancellation of Solicitation No.
36C25619Q1507. In its original complaint, protestor argued "[t]he VA has offered no
justification, let alone a rational one, for cancelling the Solicitation." The original complaint
contained one Count, titled: "**The VA's Decision to Cancel the Solicitation was
Arbitrary and Capricious, Lacked Rational Basis, and Violated Federal
Procurement Regulation and Law.**" (capitalization and emphasis in original). In Count
I, protestor asserted that "MCI submitted pricing was *substantially lower* than that
expressed in the Solicitation's accompanying documents." (emphasis in original). MCI's
original complaint also alleged that "[u]pon information and belief, a representative from
Quest Diagnostics communicated with the contracting officer responsible for the
Solicitation regarding the substance of the Solicitation," and that "the VA cancelled the
Solicitation because the VA recognized (1) that setting-aside the Solicitation had
disturbed long-standing relationships with the national laboratory-services companies,
and/or (2) that MCI's pricing could be beat by non-SDVOSB concerns, should the
Solicitation be cancelled and reissued 'full and open' rather than restricted."

---

[7] For instance, Mr. Basten's evaluation for [redacted] states that [redacted] "is not
accredited, at this time, to perform any of the tests that were required by this RFQ," and
"[s]erious staffing concerns exist to due to the number of employees."

This court granted a motion to intervene filed by LabCorp. Thereafter, the administrative record was filed. Subsequently, protestor filed an amended complaint. Protestor's amended complaint removed any allegations that could have otherwise been construed as bad faith on the part of the VA. The amended complaint also removed any mention of Quest Diagnostics, Inc. In the amended complaint, protestor asserts that the technical evaluation "was based in technicalities and formalities, and such improper and erroneous evaluations appear to be the ostensible basis for the cancellation. Therefore, the VA's actions were arbitrary and capricious, lacked rational basis, and violated federal procurement regulation and law." In the "**CONCLUSION**" section of protestor's amended complaint, MCI

respectfully requests that this Court:

A. Declare the VA's decision to cancel the Solicitation to be arbitrary and capricious and in violation of the FAR;
B. Instruct the VA to reopen the Solicitation and evaluate MCI's offer in a fair, non-arbitrary fashion, in accordance with the FAR and the stated requirements of the Solicitation;
C. Order the VA to pay MCI damages in the amount of its bid preparation and proposal costs; and
D. Award any other monetary and injunctive relief the Court determines is appropriate.

(capitalization and emphasis in original).

Based on the schedule agreed to by the parties, protestor filed a motion for judgment on the administrative record, which challenged Mr. Basten's evaluation of protestor MCI's proposal. Defendant and intervenor then each filed a combined motion to dismiss the protest for lack of subject-matter jurisdiction, cross-motion for judgment on the administrative record, and further responses and replies were exchanged.

## DISCUSSION

Defendant first moves to dismiss the above-captioned bid protest under Rule 12(b)(1) (2019) of the Rules of the United States Court of Federal Claims (RCFC), asserting that the United States Court of Federal Claims lacks subject-matter jurisdiction to review an objection to the cancellation of a solicitation for which protestor has not alleged that the government has violated any specific statute or regulation. It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428 (2011); see also Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when

no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y & H Corp., 546 U.S. at 506; see also Hymas v. United States, 810 F.3d 1312, 1317 (Fed. Cir. 2016) (explaining that a federal court must satisfy itself of its jurisdiction over the subject-matter before it considers the merits of a case); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise *sua sponte*, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006)).

This court has jurisdiction to hear bid protests pursuant to 28 U.S.C. § 1491(b)(1) (2018) of the Tucker Act, which provides that this court has

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009). The Administrative Dispute Resolution Act of 1996 (ADRA), codified at 28 U.S.C. § 1491(b)(1)–(4), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001).

Defendant in the above-captioned bid protest asserts that 28 U.S.C. § 1491(b)(1) "confers the Court with only limited jurisdiction to consider a protestor's 'object[ions] to' (i) 'a solicitation by a Federal agency,' (ii) 'a proposed award or the award of a contract,' or

(iii) 'any alleged violation of a statute or regulation in connection with a procurement or a proposed procurement.'" (quoting 28 U.S.C. § 1491(b)(1)). Defendant further argues that "[h]ere, MCI challenges only the VA's decision to cancel the solicitation . . . and the protest of a *cancellation* is not an 'objecti[on] to a solicitation . . . for bids or proposals for a proposed contract or to a proposed award or the award of a contract.'" (second alteration and second ellipses in original) (emphasis in original) (quoting MORI Assocs., Inc. v. United States, 102 Fed. Cl. 503, 523 (2011) (quoting 28 U.S.C. § 1491(b)(1))). Defendant argues that MCI's protest of the cancellation must meet section 1491(b)(1)'s third prong, an "'alleged violation of a statute or regulation in connection with a procurement or proposed procurement.'" (quoting 28 U.S.C. § 1491(b)(1)) (citing Tenica & Assocs., LLC v. United States, 123 Fed. Cl. 166, 172-73 (2015); Savantage Fin. Servs., Inc. v. United States, 123 Fed. Cl. 7, 33-34 (2015), aff'd, 688 F. App'x 366 (Fed. Cir. 2016)). Finally, defendant asserts that "[a]lthough MCI variously asserts that the cancellation 'violated federal procurement regulation and law,' MCI never identifies what law or regulation the VA allegedly 'violated.'" (internal references omitted). Protestor's filings, including its responsive ones, focus only on Mr. Basten's evaluation of its proposal and are void of any jurisdictional arguments or counter-arguments.

The United States Court of Appeals for the Federal Circuit's ruling in Resource Conservation Group, LLC v. United States discusses this court's bid protest jurisdiction. See Resource Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242–47 (Fed. Cir. 2010). The issue in Resource Conservation Group was whether the United States Court of Federal Claims had jurisdiction to hear a protest of the government's solicitation of bids to lease property owned by the United States Naval Academy. The Federal Circuit found that the protestor lacked jurisdiction under the ADRA because the leasing of land did not constitute a "procurement." Resource Conservation Grp., LLC v. United States, 597 F.3d at 1242 (quoting Southfork Sys., Inc. v. United States, 141 F.3d 1124, 1132 (Fed. Cir. 1998)). The court also found, however, that the United States Court of Federal Claims had jurisdiction by other means, holding that the enactment of the ADRA did not remove any pre-ADRA-established jurisdiction of the United States Court of Federal Claims. See id. The Federal Circuit looked to the legislative history of the ADRA, concluding that "Congress did not intend to alter or restrict the Court of Federal Claims' existing jurisdiction in cases not covered by the new statute." Resource Conservation Grp., LLC v. United States, 597 F.3d at 1246. This included the United States Court of Federal Claims' pre-ADRA jurisdiction to hear nonprocurement-based protests based on "'an implied contract to have the involved bids fairly and honestly considered.'" Resource Conservation Grp., LLC v. United States, 597 F.3d at 1246 (quoting Southfork Sys., Inc. v. United States, 141 F.3d at 1132).

Defendant in the above-captioned bid protest questions this court's ability hear protestor's challenge of the VA's cancellation of the solicitation to procure laboratory testing and services for the Michael E. DeBakey VA Medical Center. As stated by a Judge of the United States Court of Federal Claims in MORI Associates, Inc. v. United States, 102 Fed. Cl. at 522, "prior to the passage of the ADRA it was settled law that our court had jurisdiction over bid protests seeking to enjoin the arbitrary cancellation of solicitations, as an alleged breach of the implied contract to fairly and honestly consider

bids." MORI Assocs., Inc. v. United States, 102 Fed. Cl. at 522 (citing Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1152–54 (Fed. Cir. 1994)). The court in MORI Associates further held that "the FAR section 1.602–2(b) requirement that contracting officers shall '[e]nsure that contractors receive impartial, fair and equitable treatment' is, among other things, the codification of the government's duty, previously implicit, to fairly and honestly consider bids." MORI Assocs., Inc. v. United States, 102 Fed. Cl. at 523 (quoting FAR § 1.602–2(b)). The court, therefore, found that it had jurisdiction over an alleged arbitrary cancellation of a procurement under the third prong of 28 U.S.C. § 1491(b)(1) by way of the pre-ADRA established implied contract to fairly and honestly consider bids, which the court found now "expressly resides" in FAR § 1.602–2(b). See MORI Assocs., Inc. v. United States, 102 Fed. Cl. at 524.

As discussed above, the Federal Circuit held in Resource Conservation Group that the ADRA did not abrogate any previously established bid protest jurisdiction enjoyed by this court. Although the Federal Circuit's holding in Resource Conservation Group concerned this court's surviving, post-ADRA jurisdiction to hear nonprocurement-based bid protests, the court reasoned that

> it seems quite unlikely that Congress would intend that statute [28 U.S.C. § 1491(b)(1)] to deny a pre-existing remedy without providing a remedy under the new statute. See e.g., Davis v. Passman, 442 U.S. 228, 247, 99 S. Ct. 2264, 60 L. Ed. 2d 846 (1979) (holding that by enacting an amendment to the Civil Rights Act of 1964 which protects federal employees from discrimination, Congress did not intend to foreclose pre-existing alternative remedies available to those expressly unprotected by the statute).

Resource Conservation Grp., LLC v. United States, 597 F.3d at 1246; see also Def. Tech., Inc. v. United States, 99 Fed. Cl. 103, 114–15 (2011) (finding that this court had jurisdiction over the cancellation of a procurement solicitation); FFTF Restoration Co., LLC v. United States, 86 Fed. Cl. 226, 236–240 (2009). It is, therefore, consistent with Resource Conservation Group to hold that this court continues to have jurisdiction over alleged arbitrary cancellations of procurement solicitations. Moreover, given this court's pre-ADRA jurisdiction to address procurement cancellation issues, it follows that whether or not protestor alleges the violation of a specific statute or regulation, this court continues to be able to address cancellation issues. See B & B Med. Servs., Inc. v. United States, 114 Fed. Cl. 658, 660 (2014) ("Given our long history of entertaining such [arbitrary procurement cancellation] protests, the Court does not find subject-matter jurisdiction to be absent merely because the particular regulation that is violated by arbitrary cancellation is absent from the complaint."). Defendant's motion to dismiss for lack of subject-matter jurisdiction on the mere grounds that the Solicitation was canceled is denied.

Defendant and intervenor next move to dismiss protestor's complaint, also pursuant to RCFC 12(b)(1), asserting that protestor lacks standing.[8] Defendant argues that protestor did not have a substantial chance to be awarded the contract, and, therefore, is not an interested party, because protestor's "response to the solicitation was incomplete, nonresponsive, or otherwise noncompliant with the material terms of the solicitation." As discussed below, defendant's motion to dismiss highlights multiple instances in which MCI's proposal was allegedly incomplete. Included in defendant's argument are allegations that protestor did not demonstrate that protestor is appropriately certified to perform all of the laboratory tests and services required by the Solicitation. All of the instances highlighted by defendant are consistent with Mr. Basten's evaluation of MCI's proposal, which ultimately determined that MCI's proposal was technically unacceptable. As discussed above, however, protestor does not respond to any of defendant or intervenor's jurisdictional arguments, including standing, although in protestor's motion for judgment on the administrative record, protestor does respond to the merits of Mr. Basten's evaluation.

The Tucker Act, as amended by the ADRA, grants the United States Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(a)(1). In order to have standing to sue as an "interested party" under this provision, a disappointed bidder must show that it suffered competitive injury or was "prejudiced" by the alleged error in the procurement process. See Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011) (To prevail, a bid protester must first "'show that it was prejudiced by a significant error' (i.e., 'that but for the error, it would have had a substantial chance of securing the contract).'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378, 1380 (Fed. Cir. 2009)); Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1317; see also Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 281 (2012); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 693 (2010) ("In order to establish standing to sue, the plaintiff in a bid protest has always needed to demonstrate that it suffered competitive injury, or 'prejudice,' as a result of the allegedly unlawful agency decisions." (citing Rex Serv. Corp. v. United States, 448 F.3d at 1308; Statistica, Inc. v. Christopher, 102 F.3d 1577, 1580–81 (Fed. Cir. 1996); Vulcan Eng'g Co. v. United States, 16 Cl. Ct. 84, 88 (1988); Morgan Bus. Assocs., Inc. v. United States, 223 Ct. Cl. 325, 332 (1980))). In order to establish what one Judge on this court has called "allegational prejudice" for the purposes of standing, the bidder must show that there was a "substantial chance" it would have received the contract award, but for the alleged procurement error. See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 675; Hyperion, Inc. v. United States, 115 Fed. Cl. 541, 550 (2014) ("The government acknowledges that proving prejudice for purposes of standing merely requires "allegational prejudice," as contrasted to prejudice on the merits . . . ."); Bannum, Inc. v. United States, 115 Fed. Cl. 148, 153 (2014); see also Bannum, Inc. v. United States, 404

---

[8] Regarding protestor's standing, the arguments in intervenor's motion to dismiss largely track defendant's arguments.

F.3d 1346, 1358 (Fed. Cir. 2005); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir.), reh'g denied (Fed. Cir. 2004); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Statistica, Inc. v. Christopher, 102 F.3d at 1581; Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013); Lab. Corp. of Am. v. United States, 108 Fed. Cl. 549, 557 (2012). Because standing is a jurisdictional issue, this showing of prejudice is a threshold issue. See Corus Grp. PLC. v. Int'l Trade Comm'n, 352 F.3d 1351, 1357 (Fed. Cir. 2003); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002). "A bidder submitting a nonresponsive bid has no standing to protest an award, because it has no chance of receiving the award." A & D Fire Protection, Inc. v. United States, 72 Fed. Cl. 126, 138 (2006); see also Dismas Charities, Inc. v. United States, 75 Fed. Cl. 59, 61 (2007) ("[A] Final Proposal Revision that does not conform to the solicitation requirements is technically unacceptable and cannot be considered for award . . . ."); CHE Consulting, Inc. v. United States, 47 Fed. Cl. 331, 337 (2000) ("A nonresponsive bidder is not an interested party."); Ryan Co. v. United States, 43 Fed. Cl. 646, 657 (1999) ("[T]he phrase 'interested party,' as used in 28 U.S.C. § 1491(b), does not include a bidder, such as [protestor], determined to be nonresponsive, whose only chance of winning a contract is in a resolicitation.").

As explained by the United States Court of Federal Claims in Digitalis Education Solutions, Inc. v. United States:

> Only an "interested party" has standing to challenge a contract award. Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006). An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract. Id. Thus, a party must show that it is 1) an actual or prospective bidder and 2) that it has a direct economic interest. "[I]n order to be eligible to protest, one who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation." MCI Telecomms. Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989). To prove a direct economic interest, a party must show that it had a "substantial chance" of winning the contract. Rex Serv., 448 F.3d at 1308.

Digitalis Educ. Solutions, Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012); see also Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001), cert. denied, 534 U.S. 113 (2002); Centech Grp., Inc. v. United States, 78 Fed. Cl. 496, 503-504 (2007).

In the context of a pre-award bid protest which challenges the terms of the solicitation, the United States Court of Appeals for the Federal Circuit has determined that to show the requisite "direct economic interest," and, therefore, to be an "interested party" under the Tucker Act, the protestor has to have suffered a "'non-trivial competitive injury which can be redressed by judicial relief.'" See Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362–63); see also CGI Fed. Inc. v. United States, 779 F.3d 1346, 1348 (Fed. Cir. 2018); COMINT Sys. Corp. v. United States, 700 F.3d at 1383 n.7 ("[I]n Weeks Marine this court specifically held that the 'non-trivial competitive injury' standard was applicable

to 'a *pre-award* protest.'" (quoting <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1362)) (emphasis in original); <u>MVS USA, Inc. v. United States</u>, 111 Fed. Cl. 639, 647 (2013); <u>Miles Constr., LLC v. United States</u>, 108 Fed. Cl. at 797. This is a lower standard than the "substantial chance" standard used in post-award bid protests, but still requires a "showing of *some* prejudice." <u>Orion Tech., Inc. v. United States</u>, 704 F.3d at 1348-49 (quoting <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1362) (emphasis in original). This lower standard does not apply, however, to post-proposal, pre-award bid protests that are "not challenging the terms of the solicitation, as was the case in Weeks Marine." <u>Orion Tech., Inc. v. United States</u>, 704 F.3d at 1349. In such cases, the "substantial chance" standard still applies. <u>See</u> <u>id.</u> at 1348-49.

Defendant in the above-captioned bid protest asserts that protestor has not demonstrated that it was CAP certified to perform all of the Solicitation's required tests and services, a deficiency identified in Mr. Basten's evaluation. Mr. Basten included in his evaluation that protestor was "[n]ot CAP Accredited for Molecular Pathology." (capitalization in original). Protestor does not appear to dispute this deficiency in its submissions to the court. Indeed, protestor "concedes that it will require some subcontracting to perform specialized tests." Specifically, in a response to the court's Order for the parties to provide supplemental briefing regarding protestor's CAP accreditations, protestor concedes that protestor "will need to subcontract approximately 74 tests, three of which have the potential of triggering one (or more) of 52 additional tests, totaling 126 line-items" of the 611 line-items in the Solicitation's list of required laboratory tests and services. Protestor further concedes that it cannot perform these tests and services because "MCI is not CAP certified to perform molecular pathology testing."

In protestor's submissions to the court, protestor argues that it intended to use subcontractors to perform the laboratory tests and services it could not personally perform. Protestor's mention of its contemplated use of subcontractors in its proposal, however, is scant. In one section of the proposal, protestor states, confusingly, that "MCI will provide Laboratory Testing our [sic] qualified laboratory partners and will continue to actively participate in various study of laboratory testing, with a goal of enhancing clinical patient care." In addition, protestor's "**Attestation Form**,"[9] which was attached to its proposal, states that MCI's "[p]**artner laboratories that we work with have been validated on all of the testing that we currently are not**." (emphasis in original). Such is the extent of the proposal's discussion of protestor's intent to rely on subcontractors to fulfill the Solicitation's requirements. Importantly, the proposal is absent of any subcontractor names or subcontractor certifications by CLIA or CAP. MCI's proposal is also silent on how many, and which, laboratory tests or services protestor was intending to subcontract out, at what cost, the intended subcontractor(s) assay schedules and

---

[9] The Attestation Form attached to protestor's proposal appears to be in response to the Solicitation's instruction in subsection (k) of the Statement of Work, which states:

> k. Contractor shall provide written attestation that they have successfully completed the method performance validation &/or verification studies for all of the tests listed within the item list.

turnaround times—all information required of the offeror by the terms of the Solicitation.

Protestor argues that it was not required to provide any subcontractor information. Although the Solicitation does not explicitly require the submission of subcontractor information, the Statement of Work in the Solicitation instructs that "[a]ppropriate supporting documentation . . . shall be submitted to demonstrate [the] ability to meet or exceed the minimum requirements of this solicitation." At the minimum, the Solicitation required the offeror to demonstrate that it is properly certified to perform, and could perform, all 611 line-items of laboratory tests and services listed in the Solicitation. To that end, the Solicitation required that the offeror produce, among other items, its CLIA Certificate, CAP Certificate and CAP Test Activity Menu. If an offeror could not perform all of the required tests and services, it follows that in order to demonstrate that the "minimum requirements" have been met, the "[a]ppropriate supporting documentation" would necessarily include documentation that the intended subcontractors were properly certified to perform the laboratory tests and services that the offeror could not perform. This would include, among other items, the subcontractor's CLIA Certificate, CAP Certificate, and CAP Test Activity Menu. Protestor concedes that it is not properly certified to perform all of the Solicitation's laboratory tests and services, and that it required the use of subcontractors to do so. Protestor, however, failed to produce relevant information on the subcontractor or subcontractors it intended to use, including their names, CLIA Certificates, CAP Certificates, and CAP Test Activity Menus. Protestor, therefore, failed to provide the "[a]ppropriate supporting documentation" to demonstrate that it could meet the minimum requirements of the Solicitation. Protestor's proposal, therefore, is technically unacceptable.

Protestor's concession, discussed above, that it is "not CAP certified to perform molecular pathology testing," and, therefore, is unable to personally perform 126 of the 611 line-item laboratory tests and services, is also inconsistent with the Solicitation's requirements in subsection (d) of the Statement of Work, which states that the offeror "shall provide a copy of their current CAP Test Activity Menu reflective of all tests they are currently accredited to perform demonstrating laboratory's ability to perform the tests." (emphasis added). Protestor's CAP Test Activity Menu provides numerous other disciplines, including, for example, "Anatomic Pathology," "Cytopathology," and "Immunology," but does not include a discipline in Molecular Pathology. See generally College of American Pathologists, CAP Accreditation Checklists—2019 Edition, available at https://documents.cap.org/documents/2019-CAP-accreditation-checklist-summary.pdf (last visited Feb. 19, 2020) (providing all CAP Accreditation Checklists for all other disciplines listed in protestor's CAP Test Activity Menu). The court notes that, as indicated in the CAP Accreditation Checklists cited above, CAP indeed provides an accreditation in Molecular Pathology. See id. Protestor's proposal, therefore, did not "demonstrat[e]" protestor's "ability to perform the tests" required of the Solicitation, because protestor's CAP Test Activity Menu did not include Molecular Pathology as a discipline, or otherwise demonstrate it could perform such laboratory tests and services involving Molecular Pathology.[10]

_____

[10] In protestor's submissions to the court, protestor asserts that Mr. Basten's evaluation was technically inaccurate in a number of respects. In defendant's submissions to the

Defendant next argues that "although the solicitation required MCI to 'provide *a copy* of [its] standard test catalog' as part of its quotation . . . MCI provided only a link to its website . . . a deficiency highlighted by the technical evaluator." (alteration in original) (emphasis in original) (internal references omitted). Subsection (f) of the Solicitation's Statement of Work states that the "[c]ontractor shall provide a copy of their standard test catalog (electronic format preferred) of all the reference laboratory testing services available." Protestor's response to the Solicitation did not include an electronic copy of its standard test catalog. Instead, protestor's response states, under the heading "**TEST DIRECTORY**:"

> The test catalog is available on the MCI LIS allowing authorized users access to view the test catalog at any time. The test catalog is compliant with regulatory requirements of the College of American Pathologists as evidenced by MCI's CAP accreditation.
>
> Secure link to the Website – Test Director [sic] Page.
> Link: https://www.mcidiagnostics.com

(capitalization and emphasis in original). Regarding protestor's standard test catalog, Mr. Basten's evaluation states:

- **Section B.2 Statement of Work: f. Contractor shall provide a copy of their standard test catalog (electronic format preferred) of all reference laboratory testing services available.**
  - In the RFQ response MCI provides the secure link to website Link: https://www.mcidiagnostics.com

(emphasis in original).

In protestor's submissions to this court, protestor provides no explanation for including only the link to its standard test catalog in its proposal. As an initial matter, the court notes that an offeror's provision of information by website link is not equivalent to submitting such information as a physical or electronic enclosure to a proposal. Unlike a

---

court, defendant concedes that Mr. Basten committed an error in his evaluation relating to the pathology specialties displayed on MCI's CLIA certificate. The court notes that although this procurement process was not totally error-free, as indicated by this error in Mr. Basten's evaluation, as well as the VA's continual reference to ARUP Laboratories, nevertheless, protestor's proposal was properly found by the agency to be technically unacceptable. Among other reasons, protestor's proposal did not demonstrate that protestor was properly certified to perform all of the laboratory tests and services required by the Solicitation, and the proposal did not include appropriate documentation to demonstrate that MCI's intended subcontractors, if they were to be used by MCI, were properly certified to perform the tests that protestor personally could not.

physical submission, a website is a dynamic source of information which can be altered by the posting entity, or, if not secure, by others. Conversely, similar to a physical submission, an electronic submission submitted in PDF form cannot be altered after the offeror submits it to the agency. In this instance, the protestor presumably could have changed the website after the protestor submitted its proposal to the VA, or even after the deadline to submit proposals. Moreover, as this court has previously held, the government is "not required to search for additional information to assist" a protestor if it "fail[s] to include th[e] information in the correct portion of its proposal." IBM Corp. v. United States, 101 Fed. Cl. 746, 758 (2011). As indicated above, however, the court notes that the Solicitation did not explicitly mandate a specific method of transmission for the offeror's standard test catalog, as the Solicitation stated only that electronic format was "preferred."

Defendant next asserts, as did Mr. Basten's evaluation, that protestor's online test catalog was deficient for a number of reasons, including that "[n]ot all RFQ required tests are in the MCI test directory." As discussed above, protestor does not appear to dispute this deficiency. Protestor argues, in response to Mr. Basten's evaluation, that

> MCI's electronic test directory contains over 2000 tests. However, for the tests MCI cannot perform in house, subcontracting will indeed be required. The Evaluator does not list the number of tests that MCI cannot purportedly perform, only that "not all of the RFQ required tests" are in MCI's directory. This is the same repeated allegation – that MCI cannot perform the entirety of the contract on its own. But this is not required by the FAR or the stated terms of the Solicitation; rather, 13 C.F.R. [§] 125.6(a)(2)(i) permits MCI to subcontract up to half to the entire contract value – or approximately $[redacted] per year – to non-similarly-situated laboratories.

(footnote omitted) (internal references omitted).

After reviewing what is currently displayed on protestor's online test catalog, it appears that not all of the 611 line-items of laboratory tests and services required by the Solicitation are currently listed. See MCI Diagnostic Center, Laboratory Test Directory, available at http://www.mcidiagnostics.com/test-directory (last visited Feb. 19, 2020). Moreover, as discussed above, protestor's admission that it cannot personally perform 126 of the 611 line-item laboratory tests and services required by the Solicitation, and protestor's failure to provide appropriate subcontractor information, renders protestor's proposal technically unacceptable. Moreover, protestor's argument that "13 C.F.R. [§] 125.6(a)(2)(i) permits MCI to subcontract up to half to the entire contract value – or approximately $[redacted] per year – to non-similarly-situated laboratories," does not respond to the issue of whether, regardless of the number of tests protestor intended to subcontract, the appropriate documentation for subcontractors, including who the subcontractors were going to be and whether those subcontractors had the required capacity and certifications to perform the required laboratory tests or services, was

40

provided in MCI's response to the Solicitation.[11] Finally, protestor's argument that Mr. Basten failed to identify which tests protestor could not perform, does not abdicate protestor's burden to demonstrate its ability to meet the published requirements of the Solicitation.

Defendant further asserts that protestor's proposal was deficient for a number of other reasons. These deficiencies highlighted by defendant in its submissions to this court are consistent with Mr. Basten's evaluation of protestor's proposal. For example, Mr. Basten's evaluation states that, for the laboratory tests and services that were listed in protestor's online standard test catalog, "the following required elements are not provided:" "LOINC codes;" "[s]ynonyms;" "[t]est methodology;" "[m]aximum turnaround time;" "[a]ssay schedules;" and "[r]eference ranges."

The Solicitation in subsection (f) of the Statement Work states:

f. Contractor shall provide a copy of their standard test catalog (electronic format preferred) of all reference laboratory testing services available.

At a minimum the test catalog shall include:

• Ordering Code (contractor's identification code)

• LOINC Code (Logical Observation Identifier Names and Codes)

• CPT Code

• Test Name/Synonyms

• Test Methodology

• Specimen Types

• Specimen collection and handling requirements

• Test result interpretation or interpretive remarks

• Maximum Turnaround Time (TAT), excluding time required for repeat assay. For those tests offered on a STAT basis, TAT should be listed separately.

• Assay schedule- must state "MWF" for tests set up Monday, Wednesday

---

[11] The regulation at 13 C.F.R. § 125.6(a)(2)(i) (2019) states that in order to awarded an SDVOSB contract, "a small business concern must agree that . . . [i]n the case of a contract for supplies or products (other than from a nonmanufacturer of such supplies), it will not pay more than 50% of the amount paid by the government to it to firms that are not similarly situated." Id.

and Friday; "MTWTF" for Monday through Friday; "TT" for Tuesday and Thursday; "Daily" for every day.

• Assay Method

• <u>Reference Ranges</u>

(emphasis added).

As discussed above, protestor provided only a link to its website, and did not provide a copy of its standard test catalog with its proposal. Nor has protestor submitted a contemporaneous to its proposal copy of its standard test catalog for the court's current review. The court, therefore, as discussed above, is unable to reliably verify whether, at the time of protestor's submission, protestor's online test catalog included the missing information identified by Mr. Basten and raised by defendant. Moreover, regarding LOINCs,[12] the court has found no reference to such codes in what is currently displayed on protestor's online standard test catalog. Therefore, unless protestor removed the LOINCs for each test and service in its online standard test catalog after protestor submitted its proposal, protestor's proposal did not follow the Solicitation's instructions regarding the required LOINCs.

Protestor argues that its proposal "expressly addressed LOINC codes," citing to the portion of its proposal which states that protestor has the "Information Technology Expertise for questions or issues regarding LOINC and test codes, reports and website assistance." (capitalization in original). Protestor's inclusion of this statement in its proposal, however, is not equivalent to providing the LOINC codes for each test in its standard test catalog, as was required by the Solicitation.

---

[12] According to defendant:

Logical Observation Identified Names and Codes (LOINC®) "is a common language . . . for identifying health measurements, observations, and documents." LOINC.org, What LOINC is, https://loinc.org/get-started/what-loinc-is/ (last visited Dec. 18, 2019). LOINC aims "to provide a definitive standard for identifying clinical information in electronic reports" by furnishing "a set of universal names and ID codes for . . . laboratory and clinical test results in the context of existing" data-transfer protocols. LOINC.org, FAQ: LOINC Basics, https://loinc.org/faq/basics/ (last visited Dec. 18, 2019). Simply put, LOINC ensures that different electronic medical systems can readily share critical information and, by extension, that different providers in the chain of care have access to that information.

(ellipses in original) (internal references omitted).

Mr. Basten also identified that protestor's online standard test catalog omitted test synonyms.[13] The Solicitation states that, "[a]t a minimum the test catalog shall include . . . Test Name/Synonyms." The standard test catalog currently displayed on protestor's website includes a name for each laboratory test and service, but only includes synonyms for some of the laboratory tests and services. Protestor argues:

> The Solicitation's Statement of Work requires the offeror to provide "Test Name/Synonyms". The "slash" between the terms "Name" and "Synonyms" indicates that this requirement is an "or" not an "and." The requirement is an "or" because not every test name has synonyms. Therefore, MCI need not provide synonyms in every instance.

(internal reference omitted).

Defendant argues that, consistent with the United States Court of Appeals for the Federal Circuit's holding in Blue and Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007), "MCI has waived its theory that the solicitation made the inclusion of synonyms optional by using a '"slash" between the terms "Name" and "Synonyms."'" In Blue and Gold Fleet, which was a pre-award bid protest, the Federal Circuit employed the "doctrine of patent ambiguity" in interpreting the terms of a solicitation. See Blue and Gold Fleet, L.P. v. United States, 492 F.3d at 1313; see also Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1381 (Fed. Cir. 2000) ("A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties.") The court in Blue and Gold Fleet found that "'[t]he doctrine of patent ambiguity is an exception to the general rule of contra proferentem, which courts use to construe ambiguities against the drafter.'" Blue and Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (quoting E.L. Hamm & Assocs., Inc. v. England, 379 F.3d 1334, 1342 (Fed. Cir. 2004)); see also HPI/GSA 3C, LLC v. United States, 364 F.3d 1327, 1334 (Fed. Cir. 2004) ("The general rule is contra proferentem, which requires ambiguities in a document to be resolved against the drafter."); Triax Pac., Inc. v. West,

---

[13] According to defendant:

> Test synonyms consist of variations on commonly-used, qualitative test descriptions, which help doctors of different backgrounds and experience choose the right test for a given application. See generally Elissa Passiment, et al., Decoding Laboratory Test Names: A Major Challenge to Appropriate Patient Care, 28 J. General Internal Medicine 453 (2013), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3579985/ (last visited Dec. 18, 2019). Synonyms can also help laboratory personnel validate results from one test by identifying other "synonymous" tests that use a different methodology. See pp. 29-34 (discussing alternative performance assessments).

(internal references omitted).

130 F.3d 1469, 1475 (Fed. Cir. 1997) ("More subtle ambiguities are deemed latent and are accorded an interpretation favorable to the contractor under the doctrine of *contra proferentem*."); T.W. Laquay Marine, LLC v. United States, 127 Fed. Cl. 748, 762 (2016) ("A latent ambiguity should be construed against the Government in accordance with the recognized contract interpretation principle of *contra proferentum*.").

According to the United States Supreme Court, "as between two reasonable and practical constructions of an ambiguous contractual provision . . . . the provision should be construed less favorably to that party which selected the contractual language." United States v. Seckinger, 397 U.S. 203, 216, reh'g denied, 397 U.S. 1031 (1970). This doctrine of *contra proferentem* "'pushes the drafters toward improving contractual forms and it saves contractors from hidden traps not of their own making.'" Fry Commc'ns, Inc. v. United States, 22 Cl. Ct. 497, 503 (1991) (quoting Sturm v. United States, 190 Ct. Cl. 691, 697, 421 F.2d 723, 727 (1970)). Similarly, according to the United States Court of Appeals for the Federal Circuit: "When a dispute arises as to the interpretation of a contract and the contractor's interpretation is reasonable, we apply the rule of *contra proferentem*, which requires that ambiguous or unclear terms that are subject to more than one reasonable interpretation be construed against the party who drafted the document." Turner Constr. Co. v. United States, 367 F.3d 1319, 1321 (Fed. Cir. 2004) (citing United States v. Turner Constr. Co., 819 F.2d 283, 286 (Fed. Cir. 1987)); see also States Roofing Corp. v. Winter, 587 F.3d 1364, 1372 (Fed. Cir. 2009); Gardiner, Kamya & Assocs. v. Jackson, 467 F.3d at 1352; HPI/GSA-3C, LLC v. Perry, 364 F.3d at 1334 (Fed. Cir. 2004).

The Federal Circuit in Blue and Gold Fleet further held that "[u]nder the doctrine, where a government solicitation contains a patent ambiguity, the government contractor has 'a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation' in a subsequent action against the government." Blue and Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (quoting Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1381 (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996))); see also Premier Office Complex of Parma, LLC v. United States, 134 Fed. Cl. 83, 88 (2017) ("A patent ambiguity is one that is 'obvious, gross, [or] glaring.'" (alteration in original) (quoting H & M Moving, Inc. v. United States, 499 F.2d 660, 671, 204 Ct. Cl. 696, 716 (1974))); West Bay Builders, Inc. v. United States, 85 Fed. Cl. 1, 15 (2008) ("A patent ambiguity is one that is obvious, gross, glaring, so that [the] plaintiff contractor had a duty to inquire about it at the start.") (alteration in original) (internal quotation marks omitted).

Protestor in the above-captioned bid protest did not put forth any argument addressing whether the Solicitation's requirement to include "Name/Synonyms" in its standard test catalog constitutes a patent ambiguity. Nevertheless, the court finds that it does not constitute a patent ambiguity because it does not cause the Solicitation to contain "facially inconsistent provisions." See Stratos Mobile Networks USA, LLC v. United States, 213 F.3d at 1381, nor was it glaringly wrong when MCI submitted its proposal. The requirement to include "Name/Synonyms" instead is a latent ambiguity, and as such, the "general rule of *contra proferentem*" applies, "which courts use to construe ambiguities against the drafter." See Blue and Gold Fleet, L.P. v. United States, 492 F.3d

at 1313. Construing the ambiguity against defendant in the above-captioned bid protest, the court reads the Solicitation's instruction to include synonyms to be considered optional, and protestor's standard test catalog currently displayed on its website to be sufficient to meet the requirements of the Solicitation in this particular regard.

As discussed above, defendant and Mr. Basten also point out that the standard test catalog on protestor's website is missing other items required by the Solicitation relating to "[t]est methodology,"[14] "[m]aximum turnaround time,"[15] "[a]ssay

---

[14] According to defendant:

> Test methodology, as the term implies, concerns the manner in which a laboratory assesses and/or measures the analyte of interest to the clinician ordering the test. There may be multiple testing methodologies for the same analyte, which rely on different biological, chemical, or physical principles, and which vary in complexity, speed, and/or reliability. Consequently, depending on the clinical circumstances, one methodology may be better suited than another methodology for testing the same analyte. See generally Robert L. Schmidt & Rachel E. Factor, Understanding Sources of Bias in Diagnostic Accuracy Studies, 137 Archives of Pathology & Laboratory Medicine 558, 560 (2013), available at https://www.archivesofpathology.org/doi/pdf/10.5858/arpa.2012-0198-RA (last visited Dec. 18, 2019) ("[D]ifferences in methodology can lead to different outcomes[.]").

(footnote omitted) (internal references omitted).

[15] According to defendant:

> Maximum turnaround time, as that term implies, generally concerns the longest anticipated interval (e.g., hours, days, weeks) between the testing laboratory's receipt of the specimen and the laboratory's reporting of results. See McGraw-Hill Dictionary of Scientific & Technical Terms 1677 (2d ed. 1978) (defining "turnaround time"). As explained above, tests for the same analyte may have different turnaround times depending on the methodology used (as well as the testing laboratory's resources). Doctors may choose one test over another when proper care demands a shorter turnaround time, or instead may choose to prioritize accuracy over immediacy. See generally Robert C. Hawkins, Laboratory Turnaround Time, 28 Clinical Biochemist Revs. 179, 179 (2007), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2282400/pdf/cbr28_4p179.pdf (last visited Dec. 18, 2019) ("[T]imeliness is perhaps the most important to the clinician, who may be prepared to sacrifice analytical quality for faster turnaround time.").

(internal references omitted).

schedule,"[16] and "[r]eference ranges."[17] These deficiencies identified by Mr. Basten are consistent with the court's review of protestor's standard test catalog currently displayed on its website. Similar to the LOINC and test name/synonyms requirements, each of these items were listed the Solicitation's minimum requirements to be included in an offeror's standard test catalog, pursuant to subsection (f) of the Statement of Work. The court is not able to verify whether the required information was on the website version of protestor's standard test catalog when protestor submitted its proposal, but reference to these items do not appear on the website now. The court, therefore, finds that protestor did not follow the Solicitation's instructions with regard to providing the test methodology, maximum turnaround times, assay schedules and reference ranges in its online standard test catalog. The court notes that one of the tables attached to protestor's proposal included the turnaround times and assay schedules for each of the 611 line-item laboratory tests and services requested by the solicitation. Nevertheless, the Solicitation required these elements to be included with protestor's standard test catalog which, as protestor states, "contains over 2000 tests." Therefore, because protestor did not provide turnaround times and assay schedules for each test and service in its online standard test catalog, protestor's proposal does not comply with the Solicitation's instructions.

Mr. Basten's evaluation also indicated that "MCI's sample patient reports did not include each of two required identifiers: 'the VA [a]ccession number and [the] MCI [a]ccession number[.]'" (alteration in original). Subsection (g) of the Statement of Work of the Solicitation required:

---

[16] According to defendant:

> The assay schedule defines when a testing laboratory will perform a particular test. The assay schedule is often stated in days of the week. Depending on a laboratory's resources, or the test methodology involved, a laboratory may not perform every assay every day of the week. Consequently, knowing when the laboratory will perform a particular assay can also inform the clinician's selection of one test over another.

(footnote omitted) (internal references omitted).

[17] According to defendant:

> [R]eference ranges convey the interval of values within the normal range for a particular test. They "are the most common decision support tool used for interpretation of numerical pathology reports." Graham Jones & Anthony Barker, Reference Intervals, 29 Clinical Biochemist Revs. S93, S93 (2008), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2556592/pdf/c br29_s_pgs93.pdf (last visited Dec. 18, 2019). Reference ranges for a particular analyte may vary depending on the test methodology used. See id. at S94. It is therefore imperative that clinicians know what reference range to expect when they order a test.

(internal references omitted).

g. Sample patient report format for the same 10 tests that were submitted for line item "e" demonstrating all required report elements are listed.

• Each test report shall include as a minimum: Patients name and identification number (social security number)[,] Physician's name (if supplied)[,] <u>Test Accession Number assigned by facility</u>[,] Facility name[,] Patients location clinic/ward (if supplied)[,] Date/Time specimen received in reference lab[,] Test ordered[,] Date/time of specimen collection (if available)[,] Date test completed[,] Test result[,] Flagged abnormal[,] Reference range[,] <u>Testing laboratory specimen number</u>[,] Name, address and CLIA number of Contractor testing facility[,] Type of specimen[,] Any additional comments related to test provided by submitting labs[.] Any other information the laboratory has that may indicate a questionable validity of test results[.] Unsatisfactory specimen shall be reported with regard to its unsuitability for testing[.]

(emphasis added). One of the ten sample test reports from protestor's proposal provides the following information:

7024 S. UTICA AVE
TULSA, OK 74136
918-895-6657
CLIA Number: 37D2011460
Director: Dr. Sherrita Wilson M.D.

MCI DIAGNOSTIC LABORATORY

Report Status: Final

| Specimen Information | | Patient Information | | Ordering Physician | |
|---|---|---|---|---|---|
| Accession: | 1909190011 | PATIENT, TEST | | Test, Physician MD | |
| Collected: | 09/18/2019 12:49 | DOB: | 10/10/1965 | Client Information | |
| Received: | 09/19/2019 12:49 | Age: | 53 | TEST CLINIC | |
| Reported: | 09/19/2019 01:03 | Gender: | Female | 123 Test Street | |
| | | ID: | test | San Antonio, TX 78260 | |
| | | | | 1111111111 | |

| Procedure | Normal | Abnormal | Units | Ref. Range |
|---|---|---|---|---|

**PATHOLOGY - IHC**

| THYROGLOBULIN | | Positive | | [ Negative ] |
|---|---|---|---|---|

Thyroglobulin Comments:

Received unstained slides. This test is performed on formalin-fixed, paraffin-embedded tissue.

Laboratory Director's Signature:



Thyroglobulin: POSITIVE
Tumor Stained: 80%

As indicated by the excerpt included immediately above, the sample report contains only one "Accession" number. (capitalization in original). It is not clear whether the number is intended to be the "Test Accession Number assigned by the facility," or the "Testing laboratory specimen number," each of which were required by the Solicitation. (capitalization in original). Nevertheless, the fact that there are not two numbers that could match these two required items, indicates that protestor's proposal is not compliant with the Solicitation's instructions.

Defendant next asserts that Mr. Basten's evaluation properly found that "MCI's quotation altogether omitted 'a copy of their results of external or alternative performance assessments for the 10 tests' reflected in its sample patient reports." In protestor's submissions to this court, protestor disputes this conclusion by Mr. Basten, citing to its production of ten "Antibody Validation Log[s]" for the same ten tests for which it provided sample test reports. Protestor's production of the Validation Logs, however, appear to be in response to a separate requirement of the Solicitation. Subsection (e) of the Solicitation's Statement of Work states that the "[c]ontractor shall provide written documentation proving that they have successfully completed method performance validation &/or verification studies as appropriate for any 10 tests (listed within the attached item list) signed by the Laboratory Director." To that effect, protestor's proposal includes an attachment titled: "**VALIDATION & VERIFICATION REPORT**," which includes ten "Antibody Validation Log[s]" for the same ten tests for which protestor provided sample reports for in its proposal. (capitalization and emphasis in original). For example, protestor's Antibody Validation Log for Thyroglobulin provides as follows:

Antibody Validation Log
Antibody Name and Clone:  Thyroglobulin (2H11+6E1)
Manufacturer and Order ID: Roche 05267820001

| No. | New Antibody ID | Result | Expected Result | Correlation Y/N |
|---|---|---|---|---|
| 1 | Thy-20 | POS | POS | Y |
| 2 | Thy-19 | POS | POS | Y |
| 3 | Thy-18 | POS | POS | Y |
| 4 | Thy-17 | POS | POS | Y |
| 5 | Thy-16 | POS | POS | Y |
| 6 | Thy-15 | POS | POS | Y |
| 7 | Thy-14 | POS | POS | Y |
| 8 | Thy-13 | POS | POS | Y |
| 9 | Thy-12 | POS | POS | Y |
| 10 | Thy-11 | POS | POS | Y |
| 11 | Thy-10 | NEG | NEG | Y |
| 12 | Thy-9 | NEG | NEG | Y |
| 13 | Thy-8 | NEG | NEG | Y |
| 14 | Thy-7 | NEG | NEG | Y |
| 15 | Thy-6 | NEG | NEG | Y |
| 16 | Thy-5 | NEG | NEG | Y |
| 17 | Thy-4 | NEG | NEG | Y |
| 18 | Thy-3 | NEG | NEG | Y |
| 19 | Thy-2 | NEG | NEG | Y |
| 20 | Thy-1 | NEG | NEG | Y |
| | | | | |
| | | | | |
| % Compliance | | | | 100% |
| Pass/Fail | | PASS | | |

_Laboratory Director Signature_

_Aug 2, 2019_
_Date_

The Solicitation in subsection (i) of the Statement of Work, however, additionally requires that the "[c]ontractor shall provide a copy of their results of external or alternative performance assessments for the same 10 tests that were submitted for line item[s] 'e & g.'" Protestor's proposal includes no additional submission which conforms to this instruction in subsection (i). Protestor's proposal, therefore, was incomplete and not in compliance with the Solicitation in that regard.

Defendant also asserts that "MCI's quotation materially altered a specific attestation required by the solicitation." In subsection (k) of the Statement of Work, the Solicitation states that the "[c]ontractor shall provide written attestation that they have successfully completed the method performance validation &/or verification studies for all of the tests listed within the item list." Protestor's proposal includes an "**Attestation Statement**," which states:

**MCI provides attestation that we fully meet the requirements as being accredited by the College of American Pathology (CAP) and Certified**

> **by (CLIA) see attachments to run all the listed test,** [sic] **We** [sic] **have successfully completed the method performance validation and/or verification on a** [sic] **many of the test** [sic] **listed. Our Partner laboratories that we work with have been validated on all of the testing that we currently are not.**

(capitalization and emphasis in original). The court finds that, by attesting only to having completed performance validation and/or verification for "many of the test[s] listed," protestor has failed to conform to the Solicitation's instruction that the offeror "shall provide written attestation that they have successfully completed the method performance validation &/or verification studies for all of the tests listed within the item list." (emphasis omitted). Moreover, protestor statement that "[o]ur [p]artner laboratories that we work with have been validated on all of the testing that we currently are not," confirms that protestor has not completed performance validation and/or verification for all of the required laboratory tests and services, and appears to be a vague reference to its possible unidentified subcontractors. (emphasis omitted).

Finally, defendant argues that "MCI's quotation was not responsive to the solicitation's past performance requirement." Subsection (j) of the Solicitation's Statement of Work reads:

> j. Contractors shall provide Past Performance information for three contracts (two must be from VA Medical Centers outside VISN 16) performed within the last five years with similar scope and complexity as this effort. The attached Past Performance questionnaire shall be used. Please have each reference complete the form and return it directly to insert CO name.[18]

Protestor's proposal provided the following information regarding past performances:

> MCI submits recent and relevant contracts for the same or similar items and other references (including contract numbers, point of contact with telephone numbers and other relevant information in accordance with FAR 52.212-1(b)(10):
>
> **Contract Number #1: W912JB-18-P-0079, Michigan Army National Guard**
>
> a. Description/Scope of Services: Medical laboratory testing and analysis services in support of Army National Guard, State of Michigan. Scope includes providing personnel,

---

[18] Although the above-quoted text refers to an "attached Past Performance questionnaire," no such document was attached to the Solicitation in the administrative record before the court.

equipment, supplies, and administration necessary to perform medical laboratory testing services.
b. Period of Performance: 09/26/2018 – 09/25/2019
c. Contract Price: $59,482.00

. . .

g. How pervious effort is similar in scope and magnitude to those specified in this requirement: This effort is similar in scope and magnitude to those specified in this requirement as MCI provides all personnel, supervision, services, and supplies necessary to perform reference laboratory testing services for the Michigan Army National Guard. This includes courier services, providing supplies and equipment, and performing pre-analytic, analytic, and post-analytic laboratory testing services.

**Contract Number #2: 1282A7-18-A-0009, USDA Forest Services, Job Corps Center**

a. Description/Scope of Services: Blanket Purchase Agreement (BPA) for medical laboratory testing and analysis services in support of USDA Forest Service, Job Corps Center (25 locations). Scope includes providing personnel, equipment, supplies, and administration necessary to perform medical laboratory testing services.
b. Period of Performance: 09/24/2018 – 09/22/2023
c. Contract Price: $250,000.00 (maximum of BPA)

. . .

f. How previous effort is similar in scope and magnitude to those specified in this requirement: This effort is similar in scope and magnitude to those specified in this requirement as MCI provides all personnel, supervision, services, and supplies necessary to perform reference laboratory testing services for the USDA Forest Services Job Corps Centers. This include courier services, providing supplies and equipment, and performing pre-analytic, analytic, and post-analytic laboratory testing services.

**Contract Number #3: W912EE-18-P-0077, US Army Corps of Engineer, Vicksburg, MS, District Headquarters**

a. Description/Scope of Services: Medical laboratory testing and analysis services in support of US Army Corps of

Engineer, District Headquarters. Scope includes providing personnel, equipment, supplies, and administration necessary to perform medical laboratory testing services.
b. Period of Performance: 10/01/2018 – 09/30/2023
c. Contract Price: $50,000

. . .

f. How previous effort is similar in scope and magnitude to those specified in this requirement: This effort is similar in scope and magnitude to those specified in this requirement as MCI provides all personnel, supervision, services, and supplies necessary to perform select lab testing services for the MVK Vicksburg, MS location. This includes courier services, providing supplies and equipment, and performing pre-analytic, analytic, and post-analytic laboratory testing services.

(emphasis in original).

The court also notes that in Mr. Basten's evaluation of protestor's proposal, he states that there was "[n]ot enough information to determine what tests were performed for previous contracts." In protestor's motion for judgment on the administrative record, protestor responds to Mr. Basten's evaluation on this issue, stating that "[t]he stated terms of the Solicitation do not require that MCI provide a detailed test listing for each of its previous contracts." Protestor also cites to Section E.1 of the Solicitation, which incorporated FAR § 52.212-1, and which states in relevant part that, "[a]s a minimum, offers must show . . . [p]ast performance information, when included as an evaluation factor, to include recent and relevant contracts for the same or similar items and other references (including contract numbers, points of contact with telephone numbers and other relevant information)."

The Solicitation required that two of the three previous contracts provided by an offeror's proposal were to have been with VA Medical Centers outside of VISN 16. Protestor's proposal, however, only included past performance information for contracts with (1) the Michigan Army National Guard, (2) the United States Department of Agriculture, Forest Service, and (3) the US Army Corps of Engineers. None of these contracts were with a VA Medical Center, let alone a VA Medical Center outside of VISN 16. Therefore, while protestor is correct that the Solicitation did not require protestor to provide lists of laboratory tests and services performed in its previous contracts, the previous contracts that protestor provided as past performance examples are not consistent with the requirements of the Solicitation. Moreover, protestor, in relying on the part of the Solicitation that incorporates FAR § 52.212-1, fails to consider that the Solicitation's instructions in the Statement of Work required a more specific response from offerors, namely, previous contracts with VA Medical Centers outside of VISN 16. The Solicitation, therefore, requires more than the minimum response required by FAR

§ 52.212-1.

In sum, protestor's proposal is deficient in a number of respects. Most importantly, protestor is unable to personally perform all of the laboratory tests required by the solicitation because, as protestor now admits, it is not CAP accredited in Molecular Pathology and therefore cannot perform 127 of the 611 line-items of laboratory test and services required by the Solicitation. Although protestor's proposal makes passing reference that it may subcontract out these laboratory tests and services that it could not perform itself to its allegedly qualified partners, the proposal was wholly absent as to the names and appropriate certifications of the subcontractor or subcontractors it intended to use, and which tests it intended to subcontract out. Moreover, it was only during the course of this litigation that protestor identified how many tests it could not perform, as this information was not included in protestor's proposal. Given that the Solicitation required that the offeror demonstrate that it could perform all of the required tests, protestor's proposal did not meet the minimum requirements of the Solicitation, and therefore protestor's proposal was nonresponsive to the Solicitation, and protestor did not have a substantial chance of award. See A & D Fire Protection, Inc. v. United States, 72 Fed. Cl. at 138 ("A bidder submitting a nonresponsive bid has no standing to protest an award, because it has no chance of receiving the award."); Ryan Co. v. United States, 43 Fed. Cl. at 657 ("[T]he phrase 'interested party,' as used in 28 U.S.C. § 1491(b), does not include a bidder . . . determined to be nonresponsive."); see also Digitalis Educ. Solutions, Inc. v. United States, 664 F.3d 1380 ("Only an interested party has standing to challenge a contract award." (internal quotation marks omitted)); Rex Serv. Corp. v. United States, 448 F.3d at 1307 ("To prove a direct economic interest, a party must show that it had a substantial chance of winning the contract." (internal quotation marks omitted)). Therefore, based on the findings and discussion above, protestor's complaint is dismissed for lack of standing.

## CONCLUSION

For the foregoing reasons, defendant's and intervenor's respective motions to dismiss for lack of subject-matter jurisdiction are **GRANTED** based on protestor's lack of standing. Protestor's complaint is **DISMISSED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**